## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**MARK ENSMINGER**, *on behalf of himself and those similarly situated*,

                Plaintiff,

v.

**CREDIT LAW CENTER, LLC a/k/a THOMAS ANDREW ADDLEMAN L.L.C., d/b/a CREDIT LAW CENTER**, *et al.*

                Defendants.

**Case No.:** 2:19-cv-2147-TC/JPO

**JURY TRIAL DEMAND**

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' 12(b)(1) MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT

Now comes Plaintiff, in opposition to Defendants, Credit Law Center, LLC and Thomas Addleman (collectively "CLC"), motion for dismissal.

### I.    NATURE OF MATTER BEFORE THE COURT

The Credit Repair Organization Act, 15 U.S.C. § 1679b(b) ("CROA") imposes a straightforward requirement: credit repair organizations such as CLC cannot receive anything of value before fully performing their agreed-upon services. Nevertheless, CLC has flouted the statute for years by requiring most of their clients — including Plaintiff — to pay a retainer at the outset of CLC's representation.  Hence, Plaintiff brought this case to put an end to CLC's systematic violation of CROA.  Defendant mischaracterizes the case as an opportunistic Plaintiff and his counsel who delayed four years after being satisfied with Defendant's services and now attempting to seek a windfall over a technical violation at the expense of bankrupting Defendant and put its employees out of work.   The more logical background is that Plaintiff discovered four years later that he was denied his rights under ECOA because Defendant had, for almost half a decade at that point, used a law license to usurp federal  consumer protections by conflating the

rules of collecting lawyer's retainers with the prohibitions of federal law designed to protect consumers in what is an otherwise dubious industry.  In reality, CLC customers had to charge balances to interest accruing credit cards and debit their deposit accounts months earlier than had they would have if they had hired one of Defendant's law-abiding competitors (who do not enjoy the benefit of collecting revenues to apply to expenses as they go by not complying with the law). Congress was serious enough about the prepayment violation that CROA mandates disgorgement. There is nothing technical about Plaintiff's complaint.

At the outset of the case, CLC sought dismissal of the Section 1679b(b) claim by attempting to create a distinction between Plaintiff's $300 retainer  and the "payments" prohibited by the statute.  As CLC put the point, Plaintiff's "**retainer funds were not 'charged or received' by CLC in return 'for the performance of any service which [CLC] had agreed to perform**.'" CLC's Mot. to Dismiss, ECF No.19 at 9 (emphasis added).  Judge Lungstrum disagreed with this artificial distinction, reasoning that "[t]he fact that the $300 was called a 'retainer' is immaterial, as the only consideration for that payment was the (future) provision of credit repair services (defendants have suggested no other consideration for that payment)…." *Ensminger v. Credit Law Ctr.,* No. 19-2147-JWL, 2019 U.S. Dist. LEXIS 155461, at *19 (D. Kan. Sep. 12, 2019).

Now that the case has been transferred from Judge Lungstrum's docket, CLC's goal is to convince the Court "**Plaintiff … [paid] the $300 to CLC for services that had already been performed for him …**" ECF No. 133 at 7 (emphasis added).  Thus, CLC has now told two contradictory versions of the same event to two different judges. This was not a mistake, or the result of new facts learned in discovery. CLC just keeps changing its story.

To distract, CLC launches into a few *ad hominem* attacks, accusing Plaintiff and his attorneys of conspiring to bankrupt the company, which is untrue. CLC then chastises Plaintiff for

seeking leave to file a First Amended Complaint to cure a pleading defect, which is entirely appropriate. *ERS Oil, LLC v. BP Am. Prod. Co*., No. CIV-13-340-RAW, 2014 U.S. Dist. LEXIS 14584, at *4 (E.D. Okla. Feb. 5, 2014) ("[J]ustice generally requires the court to give the plaintiff leave to amend at least once.").

None of this changes the fact that CLC's retainer payments directly violate Section 1679b(b)'s advance fee prohibition.  Despite characterizing its actions as "technical violations," CLC holds itself out as a law firm and demands "retainers" for performing routine credit repair services.

Despite presenting its arguments as a jurisdictional challenge, CLC's Motion is just a premature attack on the merits of Plaintiff's claim for violation of the advance fee prohibition set forth in CROA.  According to CLC, Plaintiff cannot establish a concrete injury resulting from CLC's violation of CROA's advance fee prohibition because no such violation occurred.  ECF No. 133 at 7–8.  This argument confuses a defense versus injury.  In any event, CLC's argument is inextricably intertwined with the merits, and therefore the Motion should be denied or converted to one for summary judgment under Fed. R. Civ. 56.

In addition, the motion is premature and should be ruled on after Plaintiff's forthcoming motion for class certification. Doing so would allow the parties to address CLC's arguments on a class-wide basis, while avoiding the risk that CLC waives the rule against one-way intervention.

If the Court decides to proceed on CLC's Motion, denial would still be warranted, but for different reasons.  First, CLC failed to authenticate any of the documentary evidence submitted in support of its Motion, whereas its supporting affidavit flunks the personal knowledge requirement. As such, CLC's evidentiary submissions are almost entirely inadmissible.

Second, CLC's attempt to characterize Plaintiff's $300 retainer as a "payment for services rendered" is directly contrary to the record in this case as well as the underlying retainer.  In sum, Plaintiff's Engagement Agreement, along with CLC's business records and corporate representative's deposition testimony, all confirm Plaintiff's retainer was simply an advance payment for CLC's credit repair services.

Third, there is no dispute Plaintiff has satisfied Article III's standing requirements.  This Court, as well as countless others, agree the lost time value of money meets Article III's concrete injury requirement and CLC cannot side step the Court's prior ruling by repackaging its prior rejected argument.

For these reasons, as explained more fully below, CLC's Motion should be denied.

## II.     PLAINTIFF'S RESPONSE TO CLC'S STATEMENT OF FACTS.

1.      Defendant Credit Law Center, LLC is a credit repair organization in the business of counseling and assisting its clients in the management and improvement of their credit rating. **Uncontroverted.**

2.      Plaintiff is a former customer for whom CLC successfully performed its services. **Controverted in part. CLC's reference to the "successful" performance of its services is vague and ambiguous, and consists of an inadmissible statement of opinion rather than fact. Moreover, Plaintiff disputes CLC's characterization of its performance as "successful" given that CLC collected funds from Plaintiff before verifying any corrections, deletions, or repairs on his credit bureau reports.** *See* **Addleman Dep. 58:13-15, December 9, 2019, attached hereto as Exhibit A (describing retainers as "a small amount anticipated to offset any charges after their [sic] charged.");** *see also* ████████████████████
████████████████████████████████████

████████████████████████████████

████████████████

3.      On or about February 13, 2015, CLC personnel conducted an initial consultation with Plaintiff. **The statement in this paragraph is based on CLC's business records, rather than the affiant's personal knowledge, and is therefore inadmissible due to CLC's failure to attach an authenticated copy of the relevant business records to its supporting affidavit.** *See* **Kan. L. R. 56.1(e);** *see also* **Ex. B (Thomas Dep.),** 156:20-22 (**Bo Thomas cannot recall speaking with Plaintiff). Assuming these statements are admissible, they are uncontroverted.**

4.      During this consultation, CLC personnel collected and reviewed information concerning Plaintiff's credit practices, goals, and history, and assessed the ways in which Plaintiff's credit rating could be improved and repaired. **The statement in this paragraph is based on CLC's business records, rather than the affiant's personal knowledge, and is therefore inadmissible due to CLC's failure to attach an authenticated copy of the relevant business records to its supporting affidavit.** *See* **D. Kan. L. R. 56.1(e);** *see also* **Ex. B (Thomas Dep.),** 156:20-22 (**Bo Thomas cannot recall speaking with Plaintiff). Assuming this statement is admissible, it is uncontroverted.**

5.      On or about February 13, 2015, CLC began its review and analysis of Plaintiff's credit report. **The statement in this paragraph is based on CLC's business records, rather than the affiant's personal knowledge, and is therefore inadmissible due to CLC's failure to attach an authenticated copy of the relevant business records to its supporting affidavit.** *See* **D. Kan. L. R. 56.1(e);** *see also* **Ex. B (Thomas Dep.), 156:20-22 (Bo Thomas cannot recall speaking with Plaintiff). Assuming this statement is admissible, it is uncontroverted.**

6.      On February 27, 2015, Plaintiff signed his contract with CLC. **The statement in**

this paragraph is based on CLC's business records, rather than the affiant's personal knowledge, and is therefore inadmissible due to CLC's failure to attach an authenticated copy of the relevant business records to its supporting affidavit.  *See* **D. Kan. L. R. 56.1(e). Assuming this statement is admissible, it is uncontroverted.**

7.      Through its review and analysis, CLC identified specific items in Plaintiff's credit history that appeared to be false or were otherwise susceptible to challenge, and that were improperly and negatively impacting Plaintiff's credit rating. **The statement in this paragraph is based on CLC's business records, rather than the affiant's personal knowledge, and is therefore inadmissible due to CLC's failure to attach an authenticated copy of the relevant business records to its supporting affidavit.  *See* D. Kan. L. R. 56.1(e). Assuming this statement is admissible, it is uncontroverted.**

8.      On March 4, 2015, CLC prepared and sent letters challenging these specific items to three credit reporting bureaus. **The statement in this paragraph is based on CLC's business records, rather than the affiant's personal knowledge, and is therefore inadmissible due to CLC's failure to attach an authenticated copy of the relevant business records to its supporting affidavit.  *See* D. Kan. L. R. 56.1(e).  Assuming this statement is admissible, it is uncontroverted.**

9.      On March 9, 2015, five days after CLC had fully performed the services discussed above, CLC received the $300 payment that is the subject of the only remaining claim in this lawsuit. **The statement in this paragraph is based on CLC's business records, rather than the affiant's personal knowledge, and is therefore inadmissible due to CLC's failure to attach an authenticated copy of the relevant business records to its supporting affidavit.  *See* D. Kan. L. R. 56.1(e).  In addition, CLC's reference to having "fully performed the services discussed**

above" is vague and ambiguous, and consists of an inadmissible statement of opinion rather than fact. Assuming these statements are admissible, they are controverted. CLC charged Plaintiff's credit card $300 on March 6, 2015. *See* Ex. B (Thomas Dep.), 152:4-25, 190:9-15, 238:11-16. Further, CLC did not "fully perform" any of the services specified in the Engagement Agreement prior to March 6, 2015.  *See* Declaration of Matthew S. Robertson, ¶ 3, attached hereto as Exhibit C; *id.* at Exhibit 1 (Engagement Agreement), § II (outlining services to be provided); *id.*, § V (payment not owed until deletions verified); *see also* Ex. B (Thomas Dep.), 189:16-25 (on April 10, CLC reviewed Plaintiff's credit report, verified the trade lines deleted as a result of the dispute letter, generated an invoice, and applied Plaintiff's retainer).

10.    As a result of the CLC work described above, all of which was fully (and indisputably) performed *before* CLC received Plaintiff's March 9 payment of $300, CLC successfully secured the deletion of six false debts (totaling $925) from Plaintiff's credit report that had been improperly referred to collections.  **The statement in this paragraph is based on CLC's business records, rather than the affiant's personal knowledge, and is therefore inadmissible due to CLC's failure to attach an authenticated copy of the relevant business records to its supporting affidavit.  *See* D. Kan. L. R. 56.1(e).  In addition, CLC's reference to having "fully (and indisputably) performed … the work described above" is vague and ambiguous, and consists of an inadmissible statement of opinion rather than fact. Assuming this statement is admissible, it is controverted. CLC charged Plaintiff's credit card $300 on March 6, 2015.  *See* Ex. B (Thomas Dep.), 152:4-25, 190:9-15, 238:11-16. Further, CLC did not "fully perform" any of the services called for by the Engagement Agreement prior to March 6, 2015. *See* Ex. C at Ex. 1 (Engagement Agreement), § II (outlining services provided); *id.*, § V**

(payment not owed until deletions are verified); *see also* **Ex. B (Thomas Dep.), 189:16-25 (on April 10, CLC reviewed Plaintiff's credit report, verified the trade lines deleted as a result of the dispute letter, generated an invoice, and applied Plaintiff's retainer).**

11.     These six deletions resulted in increases to Plaintiff's credit scores of 79 points (Equifax) and 68 points (Experian). **The statement in this paragraph is based on CLC's business records, rather than the affiant's personal knowledge, and is therefore inadmissible due to CLC's failure to attach an authenticated copy of the relevant business records to its supporting affidavit.** *See* **D. Kan. L. R. 56.1(e). Assuming this statement is admissible, it is uncontroverted.**

12.     And the six deletions freed Plaintiff from otherwise outstanding debt collections totaling $925. **The statements in this paragraph are based on CLC's business records, rather than the affiant's personal knowledge, and are therefore inadmissible due to CLC's failure to attach an authenticated copy of the relevant business records to its supporting affidavit.** *See* **D. Kan. L. R. 56.1(e). Assuming these statements are admissible, they are controverted in part. Plaintiff does not dispute the six deletions removed certain false debts from Plaintiff's credit report. Because the six debts at issue were false, Plaintiff disputes the deletions at issue "freed" him from outstanding debt collections.**

## III.     PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1.     CLC's credit advisor's confer with new clients about how to improve their credit profile, walk new clients through the credit repair process, and collect the client's engagement agreements and identification. Ex. B (Thomas Dep.), 62:7-15.

2.     CLC does not charge its clients for initial consultations or for sending out dispute letters. Ex. B (Thomas Dep.), 279:17-280:17.



8.      Any client who pays a retainer will have a credit balance with CLC.  Ex. B (Thomas Dep.), 110:11-15.

10.     Plaintiff Mark Ensminger is citizen of the State of Kansas. Ensminger Dep., 4:12-14, Feb. 17, 2020, attached hereto as Exhibit D.

11.     On February 27, 2015, Plaintiff signed an Engagement Agreement with CLC.  *See* Ex. C at Ex. 1 (Engagement Agreement), p. 4.

12.     The Engagement Agreement required Plaintiff to pay a $300 retainer.  *See* Ex. C at Ex. 1 (Engagement Agreement), p. 4.

13.     Plaintiff's contract provided that "[o]ther than the retainer, I understand that I will only be charged after Credit Law Center document [sic] that the negative items were repaired or

removed from my credit reports." *See* Ex. C at Ex. 1 (Engagement Agreement), p. 4.

14.     The Engagement Agreement provided Plaintiff with the right to "cancel the contract, without any penalty or obligation, at any time before midnight of the 3rd day which begins after the day the contract is signed by you."  *See* Ex. C at Ex. 1 (Engagement Agreement), pp. 4, 8.

15.     On March 6, 2015, CLC charged the $300 retainer to Plaintiff's credit card.  Ex. B (Thomas Dep), 152:4-25, 190:9-15, 238:11-16.

16.     Plaintiff's first billable event occurred on April 10, 2015. Ex. B (Thomas Dep.), 241:21-25.

17.     On April 10, 2015, CLC obtained and reviewed Plaintiff's updated credit report to verify what trade lines had been deleted. Ex. B (Thomas Dep.), 249:6-9.

18.     During this review, CLC verified that six trade lines had been deleted from Plaintiff's credit report. Ex. B (Thomas Dep.), 249:21-23.

19.     Thus, CLC created an invoice for $485 and applied Plaintiff's $300 retainer to the amount due. Ex. B (Thomas Dep.), 189:16-25; *see also* Ex. C at ¶ 4; *id.* at Exhibit 2 (April 10, 2015 invoice).

20.     On June 3, 2015, CLC obtained an updated credit report for Plaintiff, verified that 15 trade lines had been deleted from his credit report, and generated an invoice for $519.00. Ex. C at ¶ 5; *id.* at Exhibit 3 (June 3, 2015 invoice); *see also* Exhibit C at ¶ 6; *id.* at Ex. 4 (Credit Money Machine Notes), p. 2.

## IV.     STANDARD OF REVIEW

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) can raise what is known as a factual attack. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). A

party raising a factual attack may go outside the complaint and challenge the facts upon which subject matter jurisdiction depends. *Id.* a 1003. If resolution of the jurisdictional question is intertwined with the merits of the case, however, the Court must convert a Rule 12(b)(1) motion to one under Rule 12(b)(6) or Rule 56. *In re Motor Fuel Temperature Sales Practices Litig.*, No. 1840, 2009 U.S. Dist. LEXIS 9495, at *25-26 (D. Kan. Jan. 29, 2009).

When a motion under Rule 12(b)(1) has been converted to a motion for summary judgment, the court applies the same standards that govern resolution of summary judgment motions. *Bryce v. Episcopal Church in the Diocese of Colorado*, 121 F.Supp.2d 1327, 1336 (D. Colo. 2000), *aff'd*, 289 F.3d 648 (10th Cir. 2002). Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All the evidence must be viewed in the light most favorable to the party opposing the motion. *Simms v. Oklahoma ex rel Department of Mental Health and Substance Abuse Services*, 165 F.3d 1321, 1326 (10th Cir.).

## V.     ARGUMENT

### A.     CLC's Motion should be denied as a premature attack on the merits.

CLC fails to present a valid basis for dismissal under Rule 12(b)(1). Instead, CLC launches a premature (and unconvincing) attack on the merits of Plaintiff's claim. Because the Motion cannot proceed under Rule 12(b)(1), and should not proceed under Rule 56, the Court should deny CLC's Motion with leave to refile at an appropriate juncture.

**1. The Motion should be converted to one for summary judgment.**

According to CLC, Plaintiff cannot identify a concrete injury resulting from the violation of CROA's advanced fee prohibition because no such violation occurred. Though CLC is wrong, the issue here is that this argument is a direct attack on the merits, rather than Article III standing[1].

"Federal courts have repeatedly cautioned against a procedure that would allow a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction to become an attack on the merits." *Powell v. Bd. of Cty. Comm'rs*, No. CIV-18-294-D, 2019 U.S. Dist. LEXIS 87012, at *9 (W.D. Okla. May 23, 2019) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016)). While a court has discretion under Rule 12(b)(1) to review evidence outside the pleadings, it "must convert the motion to one under Rule 56 where resolution of the jurisdictional question is intertwined with the merits of the case." *In re Motor Fuel*, 2009 U.S. Dist. LEXIS 9495, at *27.

The critical issue is whether "resolution of the jurisdictional issue requires resolution of an aspect of the substantive claim." *Pringle v. United States*, 208 F.3d 1220, 1223 (10th Cir. 2000); *accord, Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1324 (10th Cir. 2002)[2].

---

[1] CLC's argument that there is no injury because it will prevail in the case would ironically deprive the Court of jurisdiction to render such an opinion because there would be no injury in the first place and thus no jurisdiction for the Court to rule; "an outcome that fundamentally misunderstands what standing is." *Carlson v. United States*, 837 F.3d 753, 759 (7th Cir. 2016). In other words, there would be no standing for every case a Plaintiff lost at trial, which would allow a Plaintiff to refile their case in state court.

[2] *See, e.g., In re Motor Fuel*, 2009 U.S. Dist. LEXIS 9495, at *27 (arguments intertwined where defendant gas company challenged standing by denying control over individual gas stations, which plaintiff needed to establish to impose vicarious liability); *Via Christi Reg'l Med. Ctr., Inc. v. Blue Cross & Blue Shield of Kan., Inc.*, 361 F. Supp. 2d 1280, 1285 (D. Kan. 2005) (converting 12(b)(1) motion to 12(b)(6) because "[a] determination of whether Chance and the Chance Plan are fiduciaries within the meaning of ERISA is both a jurisdictional question and an aspect of the substantive claim."); *Bryce*, 121 F. Supp. 2d at 1335 (jurisdictional issue intertwined with merits where first amendment defense underlying jurisdictional argument would, if applicable, bar the plaintiff's Title VII claim as a matter of law); *Potsko v. Breckenridge Family Dental, PPLC*, Civil Action No. 12-cv-01631-RBJ, 2013 U.S. Dist. LEXIS 25146, at *4 (D. Colo. Feb. 25, 2013) ("[B]ecause defendants' status as an 'employer' under Title VII is a question on the merits and not a question of subject matter jurisdiction, the Court DENIES defendants' Rule 12(b)(1) motion.").

That is precisely the case here. There is no dispute deciding CLC's jurisdictional challenge will require the Court to resolve a substantive aspect of the Section 1679b(b) claim because CLC contends no lost time value of money occurred as it performed more than $300 worth of credit repair services before collecting Plaintiff's retainer. In other words, CLC contend the $300 retainer was not actually an "advance payment," but rather compensation for the credit repair services it had already performed. See ECF No. 133 at 7. This directly challenges a critical element of Plaintiff's Section 1679b(b) claim: whether the $300 retainer constitutes an illegal advance payment for credit repair services CLC has yet to perform. By prevailing on the advance payment issue, Plaintiff will establish the central element of the Section 1679b(b) claim *and* an Article III injury in the form of the lost time value of those funds.

Accordingly, there can be no real debate Plaintiff's standing is inextricably intertwined with the merits of the Section 1679b(b) claim.  As a result, CLC's Motion must be converted to one for summary judgment motion under Rule 56.

## 2.  CLC's arguments should be decided after class certification.

Because CLC's Motion must be converted to one for summary judgment, the Court should deny the Motion with leave to refile following the ruling on class certification. Initially, the parties agreed and the Court ordered the parties address certification before summary judgment.  ECF No. 26 at 9, § 3(d) (Class certification deadline prior to dispositive motion deadline). As such, it would be premature to move forward on CLC's Motion at this time.

Putting aside the Court's Order, the general rule is that courts should decide whether to certify the proposed class before ruling on the merits. *See, e.g., Bertrand v. Maram,* 495 F.3d 452, 455 (7th Cir. 2007) ("Class-action status must be granted (or denied) early … to clarify who will be bound by the decision"); *Jeter v. Bullseye Energy, Inc.*, No. 12-CV-411-TCK-PJC, 2016 U.S. Dist. LEXIS 707, at *6 (N.D. Okla. Jan. 5, 2016) ("The Court shall proceed as it would in any

typical class action, which is to decide class-certification issues prior to summary judgment motions."); *In re Evanston Nw. Corp. Antitrust Litig.*, No. 07-cv-04446, 2013 U.S. Dist. LEXIS 173794, at *5 (N.D. Ill. Dec. 10, 2013) (certification should proceed merits); *Mendez v. Radec Corp.,* 260 F.R.D. 38, 44-45 (W.D.N.Y. 2009) (same) (collecting cases).

That is clearly the case here, given that the issue raised in the Motion — *i.e.* whether CLC "fully performed" its credit repair upon issuing the initial round of credit dispute letters, ECF No. 133 at 7 — can be resolved on a class-wide basis using common proof. *See, e.g., In re Cox Enters.,* No. 09-ML-2048-C, 2011 U.S. Dist. LEXIS 149656, at *28 (W.D. Okla. Dec. 28, 2011) (predominance looks to whether claim can be established using common proof). That is, Plaintiff entered into the same standard form Engagement Agreement as each putative class member, which dictates: (1) the scope of CLC's credit repair services; and (2) the timeframe in which CLC collects the retainer (*i.e.* seven days after contract formation). *See* Ex. C at Ex. 1 (Engagement Agreement), §§ II, V. Thus, CLC's Motion raises a central merits issue that should be addressed after the Court decides whether to certify the class.

As the deadline for class certification is less than a month away, the better route would be to deny the Motion with leave to refile after the Court rules on certification. *See, Licari*, 2019 U.S. Dist. LEXIS 104634, at *4 (denying defendants' summary judgment motions *sua sponte* to "avoid any potential issues with the rule against one-way intervention).

For all these reasons, CLC's Motion should be denied, with leave to refile at an appropriate juncture.

**B.    CLC's Motion fails on the merits.**

Assuming the Court entertains CLC's arguments at this stage of the litigation, the Motion would still fail because CLC cannot meet its burden in demonstrating Plaintiff's $300 retainer complied with CROA's advance fee prohibition for three reasons.

First, CLC's evidentiary submissions are almost entirely inadmissible and therefore cannot be considered in support of the Motion. Second, Plaintiff's Engagement Agreement, the relevant payment records, and CLC's own testimony confirms the $300 retainer was an advance payment for CLC's credit repair services. Finally, the record here is more than enough to satisfy Plaintiff's Article III standing.

**1.    CLC's Motion should be denied for failure to comply with Local Rule 56.1.**

CLC's evidentiary submissions fail to comply with Local Rule 56.1. Local Rule 56.1 provides "[a]ll facts on which a motion or opposition is based must be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories, and responses to requests for admission." D. Kan. L.R. 56(e)(1). Nevertheless, CLC made no attempt to authenticate the letters and business records attached as Exhibits B-D to the Motion. Although CLC's supporting affidavit appears to reference those documents, it contains nothing to attest to their authenticity. *See, generally,* ECF No. 133-1. As such, Exhibits B-D cannot be considered at summary judgment. *Harlan v. United Fire & Cas. Co.*, 208 F. Supp. 3d 1168, 1176 (D. Kan. 2016) ("[A]uthentication is an essential prerequisite for admitting a document into evidence at trial and for a court to consider it at summary judgment.").

CLC's supporting affidavit is equally problematic. Local Rule 56.1 requires that "[a]ffidavits … must be made on personal knowledge ….Where facts referred to in an affidavit or declaration are contained in another document … a copy of the relevant excerpt from the document must be attached." Kan. Loc. R. 56.1(d). Given this personal knowledge requirement, "an affidavit

is inadmissible if the witness could not have actually perceived or observed that which he testifies to." *KM Mentor, LLC v. Knowledge Mgmt. Prof'l Soc'y, Inc.*, 712 F. Supp. 2d 1222, 1250-51 (D. Kan. 2010).  To enforce this rule, courts disregard those portions of an affidavit that are not shown to be based on personal knowledge.  *Id.*

CLC's supporting affidavit cannot satisfy these requirements. *See, generally,* ECF No. 133-1. CLC's affiant, Bo Thomas, previously testified he could not recall ever speaking with Plaintiff. Ex. B (Thomas Dep.), 156:20-22.  And, given his position as CEO of CLC, ECF No. 133-1 ¶ 2, there is nothing to suggest Mr. Thomas had any involvement with Plaintiff's file. Consequently, the affidavit lacks any indication Mr. Thomas has personal knowledge of:

- CLC's February 13, 2015 initial consultation with Plaintiff, *id.*, ¶ 5;
- CLC's pre-contractual review and analysis of Plaintiff's credit report, *id.*, ¶¶ 6-7;
- The dates on which Plaintiff signed the contract, *id.*, ¶ 9;
- The date on which CLC issued the first round of credit disputes; *id.*, ¶ 10
- The date on which CLC collected the $300 retainer, *id.*, ¶ 11; and
- The trade lines deleted from Plaintiff's credit report, *id.*, ¶¶ 12-14.

*See id.*, ¶¶ 5-7, 9-15.

The only reasonable conclusion is that Mr. Thomas's testimony is based on his review of CLC's records business records. Nevertheless, CLC failed to attach copies of those records to the affidavit, as required. *See, generally, id.* Nor did CLC attach a copy of Plaintiff's Engagement Agreement, despite that the affidavit refers to a specific provision of that contract, along with its date of execution. *Id.*, ¶¶ 9-15; *see* D. Kan. Loc. R. 56.1(e). In other words, two thirds of CLC's supporting affidavit violates Local Rule 56.1(e), and must be disregarded when evaluating the Motion.

Accordingly, CLC fails to provide any relevant evidence that could support its arguments, much less satisfy its burden at summary judgment. For that reason, alone, CLC's Motion should be denied.

**2. CLC's receipt of the $300 retainer violates CROA's prohibition on advance payments.**

Putting aside the evidentiary issues discussed above, the record here confirms Plaintiff's $300 retainer was precisely the type of advance fee Section 1679b(b) was designed to prevent.

For starters, "[t]he purpose of a retainer is to ensure payment for *future services* that have not yet been rendered." *Heine v. Bank of Oswego*, 144 F. Supp. 3d 1198, 1216 (D. Or. 2015) (emphasis added) (citing Black's Law Dictionary (10th ed. 2014) (defining a "retainer" as "[a]n advance payment of fees for work that the lawyer will perform in the future.")). Plaintiff's retainer was no different. As the Engagement Agreement makes clear, the retainer is a fee based on the total projected costs of CLC's credit repair services, which was is applied as a "credit" against Plaintiff's first invoice. *See* Ex. C at Ex. 1(Engagement Agreement), § V (charges assessed on first invoice will be deducted from retainer); *see also* Ex. B (Thomas Dep.) 110:13-17 ("Any consumer that pays a retainer is going to end up with a credit balance for the first invoice."); Ex. A (Addleman Dep.) Dep, 58:13-15 (describing retainer as a "small amount anticipated to offset any charges after they're charged.").

Lest there be any doubt, CLC's corporate representative confirmed Plaintiff's retainer was applied in this fashion.  That is, CLC collected Plaintiff's $300 retainer on March 6, 2015, and applied it to the invoice generated on April 10, 2015. *See* Ex. B (Thomas Dep, 152:4-25; 238:11-16); *see also* Ex. C at Ex. 2 (April 10, 2015 invoice). For that reason, alone, CLC's Motion fails.

Equally important, there is no dispute CLC had not "fully performed" its credit repair services before collecting the retainer on March 6, 2015. Instead, CLC continued performing under

the Engagement Agreement until approximately June 3, 2015, the date on which CLC issued Plaintiff's final invoice. *See* Ex. C at Ex. 3 (June 3, 2015 invoice); *see also* Ex. C at Ex. 4, p. 2 (Credit Money Machine Notes). Hence, the record clearly establishes CLC received payment from Plaintiff long before completing the credit repair services called for in the Engagement Agreement.

Nevertheless, CLC contends it completed its services upon mailing out Plaintiff's first round of dispute letters on March 4, 2016, which ultimately resulted in six trade lien deletions valued at $65 apiece pursuant to the Engagement Agreement. ECF No. 133 at 7. As a result, CLC claims it was owed more than $300 from Plaintiff — $390, to be precise — prior to collecting his retainer. *Id.* Not so.

CLC's argument presumes it can break up its credit repair service into a long series of discrete tasks, and bill separately for each. This tactic, if permitted, would allow any credit repair company to nullify CROA's advance fee prohibition through clever draftsmanship. Although some courts have approved this approach this view, others have rightly recognized doing so would defeat the very purpose of the statute. *Compare Ducharme v. Heath*, No. C 10-02763 CRB, 2010 U.S. Dist. LEXIS 133299, at *13 (N.D. Cal. Dec. 16, 2010) (no violation where contract authorized "work fee" for initial consultation and first round of dispute letters) *with United States v. Cornerstone Wealth Corp.,* 2006 U.S. Dist. LEXIS 8294, *22-24 (N.D. Tex. March 3, 2006) (finding violation of Section 1679b(b) where contract purportedly authorized defendant to collect large upfront fee consisting of three "initial services," followed by two years of "free" additional work pursuant to contractual guarantee); *see also FTC v. Gill,* 265 F.3d 944, 956 (9th Cir. 2001) ("The CRO Act prohibits acceptance of *any* payment before fully performing all services ….") (emphasis in original).

But there's no need to choose sides, as CLC cannot point to any service it "completed" as of March 4, 2015 that could warrant payment under the Engagement Agreement. Unlike the agreement in *Ducharme*, the Engagement Agreement doesn't authorize fees for performing discrete tasks, such as sending dispute letters. *See, e.g., Ducharme,* 2010 U.S. Dist. LEXIS 133299, at *3 (providing for "$99.95" first work fee and ongoing monthly fees); *see* Ex. C at Ex. 1 (Engagement Agreement), § V (no fees for tasks performed prior to deletions). Instead, CLC earns its fees through everything that comes after the letter — *i.e.* the post-dispute monitoring. *Id.*

Thus, to the extent CLC's credit repair services can be broken down into separate components, its service is not "fully performed' until it completes the last step required to earn payment: documenting a deletion. *See* Ex. C at Ex. 1 (Engagement Agreement), § V (fee structure). For Plaintiff, the earliest date this could have occurred was April 10, 2015, when CLC obtained his updated credit report, documented the deletion of six trade lines, generated an invoice, and applied Plaintiff's retainer. *See* Ex. B (Thomas Dep), 241:21-242:17.

Finally, CLC cannot bolster its position by arguing the value of the initial consultation and credit report analysis provided on February 13, 2015, constituted a fair exchange for Plaintiff's $300 retainer. *See* ECF No. 133 at 6-7. Though CLC notes, in passing, that credit repair organizations typically charge between $200 and $500 for these services, *id.* at 7 n.2, CLC offers nothing to support this assertion. Even if they did, CLC provided these services two weeks *before* Plaintiff retained their services, and, in any event, CLC does not charge for these services. Ex. B (Thomas Dep.), 279:17-280:17.

Accordingly, because CLC illegally pre-charged Plaintiff $300 that he did not owe, the record confirms Plaintiff lost the time value of those funds.

### 3. The record confirms Plaintiff has standing.

The law of the case doctrine precludes CLC from re-litigating issues decided by prior judges in this case. *See, e.g., Sandoval v. Berryhill*, Civil Action No. 18-cv-02554-MEH, 2019 U.S. Dist. LEXIS 129552, at *32 (D. Colo. Aug. 2, 2019) ("Pursuant to the law of the case doctrine I will do nothing to disrupt Judge Jackson's prior ruling."); *Chevron Corp. v. Stratus Consulting, Inc.*, Civil Action No. 10-cv-00047-MSK-MEH, 2010 U.S. Dist. LEXIS 46778, at *10-11 (D. Colo. Apr. 13, 2010) ("Judge Kane's conclusion is law of this case, and the law of the case doctrine generally 'dictates that prior judicial decisions on rules of law govern the same issues in subsequent phases of the same case.'") (quoting *Been v. O.K. Industries, Inc.,* 495 F.3d 1217, 1224 (10th Cir. 2007)).

Previously, Judge Lungstrum denied CLC's motion to dismiss for lack of standing and held: [t]he Court agrees with these courts that the loss of the time value of money — even a small amount — constitutes a tangible financial injury that satisfies the requirement of an injury in fact for purposes of standing. The fact of such injury from the loss of the use of money is an accepted economic reality, and the Supreme Court has confirmed that 'an identifiable trifle' is enough of an injury to create standing." *See, e.g., Ensminger v. Credit Law Ctr.,* No. 19-2147-JWL, 2019 U.S. Dist. LEXIS 155461, at *7 (D. Kan. Sep. 12, 2019)).

This opinion is not an outlier as courts throughout the country agree the lost time-value of money — even a temporary deprivation — satisfies Article III's concrete injury requirement. *Van v. LLR, Inc.*, 962 F.3d 1160, 1164 (9th Cir. 2020) ("[W]e hold that the temporary loss of use of one's money constitutes an injury in fact for purposes of Article III."); *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) ("The question is whether delay alone is a 'concrete' injury. It is. MSPA alleges a type of economic injury, which is the epitome of 'concrete.'"); *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 66, 442 U.S.

App. D.C. 42 (D.C. Cir. 2019) (per curiam) ("The delay in those Plaintiffs' receipt of their refunds, and the forgone time value of that money, is an actual, tangible pecuniary injury.") (discussing damages, rather than standing); *Murphy v. Schaible, Russo & Co., CPAs, LLP*, Civil Action No. 19-cv-2808-WJM-NYW, 2020 U.S. Dist. LEXIS 74254, at *15-16 (D. Colo. Apr. 28, 2020) ("While the Tenth Circuit has not spoken to whether the loss of time value of money can constitute an injury in fact, other federal courts have so held, and the Court finds the reasoning in those decisions to be persuasive.").

In this case, there is no doubt Plaintiff lost the time value of his money by paying for services he did not owe at the time.  To summarize, on March 6, 2015, CLC charged Plaintiff's credit card $300 pursuant to the Engagement Agreement. *See* Ex. B (Thomas Dep.), 152:4-25, 190:9-15, 238:11-16; *see also* Ex. C at Ex. 1 (Engagement Agreement), p. 4. The Engagement Agreement provided the retainer would be applied as a "credit" to Plaintiff's first invoice.  Ex. C at Ex. 1 (Engagement Agreement), § V (detailing how retainer agreement will be applied). Moreover, CLC's corporate representative confirmed the retainer was held form March 6, 2015 until April 10, 2015, when CLC updated Plaintiff's credit report, verified the deleted trade lines, generated an invoice, and applied the retainer to the invoice balance. Ex. B (Thomas Dep.), 153:4-17.  This was the date of Plaintiff's first billable event. *Id.* at 241:21-25. Because CLC required Plaintiff to pay $300 for services he had yet to receive, there is no real debate Plaintiff lost the time-value of those funds as Judge Lungstrum previously ruled.

CLC's remaining standing arguments are not persuasive. For instance, CLC relies on a recent decision from the Northern District of Illinois to contend that a bare violation of Section 1679b(b) cannot satisfy Article III's standing requirements. *See* Mot. at 8 (citing *Perta v. Nat'l Credit Care Corp.*, No. 18-cv-5767, 2019 U.S. Dist. LEXIS 168916, at *11 (N.D. Ill. Sep. 30,

2019). But the fact that the *Perta* plaintiff failed to allege any concrete injury adds nothing to the debate, and Plaintiff has already identified facts sufficient to establish standing.

Next, CLC suggests its systemic violations of CROA's advance payment prohibition is much ado about nothing because Plaintiff did not voice any concerns about the quality of its services, and ultimately received what he paid for. ECF No. 133 at 9. Not so. As Plaintiff explained during deposition, he was led to believe hiring "Credit Law Center" meant "an attorney would be actually handling every step of the case …." Ex. D (Ensminger Dep), 33:1-8. That wasn't the case, which is what makes CLC's description of its "retainer" misleading. Because retainers are generally associated with the legal profession, few would question the propriety — let alone legality — of such a fee. Put simply, CLC holds itself out as a law firm, lures customers in, and charges a sizeable down payment.

The natural consequence of CLC's retainer is that it locks the customer in, reducing the chances she will seek out alternative providers. This has the greatest impact on those with limited economic means, who, according to studies conducted by the GAO, are less likely to understand their rights in the dispute process. *See* U.S. Gov't Accountability Office, *Credit Reporting Literacy, Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts*, 39, GAO 05-223 (March 2005), *available at* https://www.gao.gov/assets/gao-05-223.pdf (last visited April 15, 2021). As such, it eliminates the consumer's right to receive full performance before committing her limited funds, thereby defeating the purpose of CROA's advance payment prohibition.

Apart from harming the consumer, CLC's violation of consumer protection statutes that unethical businesses not be given a competitive advantage over scrupulous businesses. The advantage that CLC has over their competitors who follow the law is a source of realized income

that can immediately be applied to costs and overhead. The law abiding credit repair organization has to wait until the credit repair services for which it was hired are actually completed, while CLC is using a law license to obtain money for their credit repair activities at a time that their competitors cannot.

Nevertheless, CLC's apparent disdain for CROA has no bearing on the standing inquiry. To demonstrate his standing, Plaintiff need only identify facts which, when taken as true, satisfy Article III's requirements. Here, there is no dispute CLC's violation of CROA deprived Plaintiff of the time value of his money. Because these facts demonstrate a concrete injury, CLC's Motion should be denied.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully asks the Court to DENY CLC's motion to dismiss under Fed. R.  Civ. P. 12(b)(1) and, if applicable Fed. R. Civ. P. 56.

Respectfully Submitted,

By: /s/ Matthew S. Robertson
Michael H. Rapp            #25702
A.J. Stecklein             #16330
Matthew S. Robertson       #27254
Stecklein & Rapp Chartered
748 Ann Ave
Kansas City, KS 66101
Telephone:    (913) 371-0727
Facsimile:    (913) 371-0727
Email: mr@kcconsumerlawyer.com
       aj@kcconsumerlawyer.com
       msr@kcconsumerlawyer.com

By: /s/ Gregg M. Barbakoff
Keith J. Keogh (*pro hac vice*)
Gregg M. Barbakoff (*pro hac vice*)
Keogh Law, Ltd.
55 West Monroe Street
Suite 3390
Chicago, Illinois 60603
(312) 726-1092
Email: keith@keoghlaw.com
         gbarbakoff@keoghlaw.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 19, 2021, I caused a this Document to be filed with the Clerk of the Court using CM/ECF, which caused all counsel and parties to be served via email.

<u>/s/ Matthew S. Robertson</u>