```
 1                IN THE UNITED STATE DISTRICT COURT
 2                    FOR THE DISTRICT OF KANSAS
 3
 4    MARK ENSMINGER, on behalf of    )
 5    himself and those similarly     )
 6    situated,                       )
 7                  Plaintiffs,       )
 8    v.                              ) Case No.
 9    CREDIT LAW CENTER, LLC, a/k/a   ) 2:19-cv-2147-JWL-JPO
10    THOMAS ANDREW ADDLEMAN, LLC,    )
11    d/b/a CREDIT LAW CENTER,        )
12    et al.,                         )
13                  Defendant.        )
14    _____)
15
16                      **CONFIDENTIAL**
17
18         DEPOSITION OF BO JOHN LEE THOMAS,
19    taken on behalf of Plaintiffs, at the
20    law offices of Spencer Fane, LLP, 1000 Walnut
21    Street, Suite 1400, Kansas City, Missouri,
22    beginning at 8:53 a.m. and ending at
23    3:38 p.m., on December 10, 2019, before me,
24    NAOLA C. VAUGHN, RPR, CRR, MO CCR No. 1052.
25
```

Page 62

1  between some attorneys who still don't think so.
2       Credit advisers. How many credit
3  advisers do you have?
4     A.  I believe 22.
5     Q.  Okay.
6     A.  Maybe 23.
7     Q.  All right. And what is their role?
8     A.  Their role is advising the client on
9  things the consumer can do themselves to improve
10 their credit profile.
11    Q.  All right.
12    A.  And walking them through and
13 explaining the credit repair process. Collecting
14 a contract and ID documentation and submitting it
15 to processing.
16    Q.  And you called it onboarding earlier.
17      Is that what you would describe that
18 process as, what you just explained?
19    A.  Yes.
20    Q.  Okay. And do they have -- and
21 onboarding is something they do when the client
22 first signs a contract for service; correct?
23    A.  Yes.
24    Q.  Okay. After that initial onboarding
25 process is complete, does the credit adviser

Page 63

1  continue to work with the client they onboarded?
2     A.  At times.
3     Q.  Okay. What would be the reason why
4  they might continue the relationship or the
5  communication?
6     A.  Sometimes a consumer will reach back
7  out to them with a question in regards to the
8  direction the credit adviser gave to them on the
9  things they could do. Sometimes the consumer is
10 going to ask a question about our process. So
11 they're there to just support that.
12    Q.  Are they the point of contact for the
13 client if the client has any questions?
14    A.  No, not necessarily. They can be, but
15 we're communicating with them from the customer
16 service department as well.
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]

Page 64

1  [redacted]
2     Q.  Okay. You talked about explaining the
3  credit repair process to the client.
4        Can you explain the credit process --
5  credit repair process to me?
6     A.  Sure. We're going to get a copy of a
7  credit report, go over that line by line with the
8  consumer. Identify any inaccurate or incomplete
9  information that we can challenge.
10 [redacted]
11 [redacted]
12 [redacted]
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]

Page 65

1  [redacted]
2  [redacted]
3  [redacted]
4  [redacted]
5        So when those consumer disputes -- a
6  report comes back, if the item's deleted,
7  fantastic. We're going to generate an invoice and
8  charge for that. If it's updated or verified,
9  we'll then evaluate the situation with the
10 consumer.
11 [redacted]
12 [redacted]
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17    Q.  Okay.
18    A.  But that's the -- most of the credit
19 repair process.
20    Q.  Gotcha.
21       And so working backward a little bit,
22 when you explain how the consumer can either move
23 forward with CLC or do the work themselves --
24    A.  Um-hum.
25    Q.  -- how does that conversation go?

MARK ENSMINGER vs CREDIT LAW CENTER, LLC, ET AL.
Confidential          Bo John Lee Thomas on 12/10/2019          Pages 82..85

Page 82

```
1    A.   That's going to get processed and put
2  in the bank.
3    Q.   Okay.
4  [REDACTED]
5
6
7
8
9
10   Q.   Okay.  And so when you say it's put in
11 the bank, what -- Mr. Addleman testified to what
12 bank it is yesterday, but I forget.
13 [REDACTED]
14
15
16        Do you have any other bank you bank
17 with on the credit repair side?
18   A.   No.  Not anymore.
19   Q.   And during the class period, have you
20 banked with anybody else?
21 [REDACTED]
22
23   Q.   How long has that been?
24   A.   That was the entire time.
25   Q.   Oh.
```

Page 83

```
1    A.   Up until recently.
2    Q.   When did you stop doing that?
3    A.   I believe in a year, year and a half.
4  [REDACTED]
5
6
7
8    A.   For CLC on the credit side, I'm aware
9  of one.
10   Q.   Okay.
11   A.   CLC itself, I believe, had more than
12 one.
13   Q.   Okay.  I understand there's another
14 account on the legal side?
15   A.   Yes.
16 [REDACTED]
17   A.   Yes.
18   Q.   So there's one account?
19   A.   One account for CLC, yes.
20   Q.   On the credit repair side?
21   A.   On the credit repair side.
22   Q.   How do you describe that account?
23 Just the account or --
24   A.   Yeah.  Just the account.
25   Q.   Is it a checking account?
```

Page 84

```
1  [REDACTED]
2
3
4
5
6         Is it put in the bank that day?
7    A.   Depends on when the payment comes in,
8  if it's processed in time, if it's a check, there
9  would be -- somebody processes.  We're using an
10 electronic digital transfer of processing --
11   Q.   Okay.
12   A.   -- rather than driving it to the bank.
13   Q.   Isn't that great.
14        So you can just take a picture and it
15 automatically gets deposited?
16   A.   Yes.
17   Q.   Wonderful.  So only if it's cash would
18 they have to make that trip to the bank; correct?
19   A.   Correct.
20   Q.   So if it's a retainer, explain to me
21 what happens when you get a $500 check.
22   A.   That process -- excuse me.  That's
23 [REDACTED]
24
25
```

Page 85

```
1  [REDACTED]
2
3
4
5
6
7
8
9    A.   Yes.  Because there's no -- no invoice
10 exists yet.
11   Q.   Okay.  And what about the check itself
12 and it being deposited?  Is it deposited the same
13 way as when it's applied to an invoice?
14   A.   Yes.
15 [REDACTED]
16
17
18
19        And right into the one account that
20 you all have?
21   A.   Um-hum.
22   Q.   Okay.
23   A.   Yes.
24   Q.   Do -- who -- are you a signator on
25 that account?
```

Page 90

1  retainer.
2      Q.   Okay. Any other examples you can
3  think of?
4      A.   No, not at the current moment.
5      Q.   Okay. If you think of anything else
6  along the way, please let me know.
7      A.   Okay.
8      Q.   You said sometimes it depends on the
9  type of account you're pursuing it wouldn't be
10 required.
11          Give me an example of that.
12     A.   I would say example -- a good example
13 there would be a single account reporting to just
14 one of the three bureaus that we've got really
15 good documentation on, or the consumers well aware
16 of what the account is and what is inaccurate
17 about it, whereas, you know, documentation that it
18 is a direct contradiction what's on the report.
19     Q.   Okay. So with credit reporting cases,
20 is it fair to say that it's not uncommon when a
21 consumer comes and says, this isn't correct, I
22 don't owe this money, they often can't prove a
23 negative, so they don't have a lot, and you're
24 basing it essentially on what the consumer's
25 telling you and kind of your instinct of whether

Page 91

1  they're being forthright, based on a whole
2  collection of facts. But you may not know for
3  sure. You don't have any concrete evidence.
4          Is that kind of where you're going
5  with this?
6          MR. HUDSON: Object to the form of the
7  question.
8          You can answer.
9      A.   Somewhat. It's -- I wouldn't -- I
10 guess I would say somewhat. When you have
11 something that's misreporting or inaccurate on a
12 credit report, sometimes the documentation from a
13 consumer doesn't exist.
14     Q.   BY MR. HUDSON: Um-hum.
15     A.   Because it's just inaccurate
16 information.
17     Q.   Right.
18     A.   So at that point, yes, I would say
19 there's nothing for the consumer to produce to
20 prove their innocence.
21     Q.   Okay.
22     A.   Or inaccurate.
23     Q.   And so by contrast, if they say this
24 information, this bankruptcy should be gone
25 because it's 15 years and it's obsolete, you can

Page 92

1  look at it and know as a matter of law it should
2  be gone. Is that an example?
3      A.   At times. At times that would be an
4  example as well.
5  [redacted]
6  [redacted]
7  [redacted]
8  [redacted]
9      Q.   Okay.
10     A.   The amount of items on a credit report
11 would sometimes determine that.
12 [redacted]
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17         MR. HUDSON: Object to the form of the
18 question. Sorry.
19     A.   No, not necessarily. It could be
20 both. Sometimes it could be one but not the
21 other. It's really just a case-by-case situation.
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]

Page 93

1  [redacted]
2  [redacted]
3         But I wouldn't say a hard-and-fast
4  rule of when it is not. Other than the amount is
5  probably the most common reason, which is
6  disclosed on our consumer contract.
7      Q.   Okay. What do you mean by that, the
8  amount?
9  [redacted]
10 [redacted]
11 [redacted]
12 [redacted]
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22     Q.   Okay.
23 [redacted]
24 [redacted]
25 [redacted]

Page 94

1  don't follow it to the T.
2      Q.   Okay.  And when you say it's a
3  guideline, do you mean that could be a
4  circumstance where it could be waived in certain
5  situations?
6      A.   Yes.
[lines 7-18 redacted]
19     A.   No, I wouldn't say that because if
20 it -- if it -- the exception's given for one and
21 the reasons are the same, one would think that the
22 exception would be given to the other as well.
[lines 23-25 redacted]

Page 95

[lines 1-11 redacted]
12     Q.   Who else's decision might it be?
13     A.   They would take that to John to ask
14 for an exception.
15     Q.   Okay.
16     A.   If John felt that it was prudent --
17 well, actually John's going to take that to me,
18 and then ultimately I would make the decision of
19 whether we should, shouldn't, waive or not waive.
20     Q.   Okay.  And how often does that kind of
21 situation come to your attention?
22     A.   A fair amount.
23     Q.   More than twice a week?
24     A.   Yes.
25     Q.   More than ten times a week?

Page 96

1      A.   Depends on the week.
2      Q.   Okay.  So as a general number, fair to
3  say around ten times a week?
4           MR. HUDSON:  Object to the form of the
5  question.
6      A.   Depends on the week.  I can't say
7  without guessing that it would be ten times this
8  week, ten times next week.
9      Q.   BY MS. WELLS:  That's fine.
10     A.   It just depends on the week.
[lines 11-15 redacted]
16     Q.   Do you know what the most you've ever
17 charged for a retainer is?
18     A.   No.
19     Q.   Okay.  Is there -- so there's no
20 range?
21     A.   I'm assuming there's a range.  I mean,
22 there's been the smallest one we've collected and
23 the largest.  So -- but I don't know what those
24 numbers would be.
25 [redacted]

Page 97

[lines 1-5 redacted]
6      Q.   So do they have guidelines or some
7  kind of formula then to figure that out?  Like if
8  I was a credit adviser, I would have no idea what
9  you wanted me to charge.  If you said, Amy, you
10 start tomorrow, I would be clueless as to how much
11 to charge them.
[lines 12-25 redacted]

Page 110

STET

1  upon request from the consumer.
2      Q.  Okay.  So let's talk about the
3  referral fee that the consumer can get for sending
4  in a new client to you.
5      A.  Um-hum.
6      Q.  Is it only if that new person signs up
7  with CLC?
8      A.  Yes.
9      Q.  Okay.  And how much do they get --
10 [redacted]
11     Q.  Okay.  Are there any other situations
12 where a consumer would have a credit balance?
13     A.  They're going to have a credit
14 balance -- any consumer that pays a retainer is
15 going to end up with a credit balance --
16     Q.  Okay.
17     A.  -- for the first invoice.
18 [redacted]
19 [redacted]
20 [redacted]
21         MR. HUDSON:  Object to the form of the
22 question.  Go ahead.
23     A.  I don't -- the same way that they
24 could end up with retainers or referrals, the
25 payment plan shouldn't change any of that.

Page 111

1      Q.  BY MS. WELLS:  Okay.  So basically,
2  the kind of scenario I'm asking about, you're
3  familiar with my client, Mr. Ensminger's --
4      A.  Yes.
5      Q.  -- account with CLC; correct?
6      A.  Um-hum.
7      Q.  Okay.  That's yes?  Sorry.
8      A.  Sorry.  Yes.
9      Q.  So the -- he started with a retainer,
10 and then he ultimately did end up on a payment
11 plan; is that correct?
12     A.  Yes.
13     Q.  And do you know what his payment plan
14 entailed?
15 [redacted]
16 [redacted]
17 [redacted]
18     Q.  Okay.  And did he ever make a referral
19 to CLC?
20     A.  I'm not aware that he did or he
21 didn't.  Based on review of the invoice and an
22 email, I'm assuming that he did.
23     Q.  That he did?
24     A.  I believe that he did.
25     Q.  Okay.

Page 112

1  [redacted]
2  [redacted]
3  [redacted]
4  [redacted]
5  [redacted]
6  [redacted]
7  [redacted]
8  [redacted]
9  [redacted]
10 [redacted]
11     A.  I don't.  Because it was agreed to by
12 the credit adviser.
13     Q.  Okay.  If it was by -- well, actually,
14 either way, would -- when you say it was agreed to
15 by the credit adviser, wouldn't it be automatic at
16 the end of representation by CLC that any credit
17 be refunded to the client?
18     A.  Oh, absolutely that happens, yes.
19     Q.  Okay.  So regardless of whether it was
20 a referral fee or a credit balance from his
21 payment plan, he would automatically get that
22 refund; correct?
23     A.  If it was a refund and not applied
24 to -- it didn't have an outstanding invoice, yes.
25     Q.  Okay.  It wouldn't have to be approved

Page 113

1  by a credit adviser; correct?
2      A.  No.  The referral would have to be
3  approved by a credit adviser.  So what -- that's
4  why -- what I can't tell based on the notes --
5      Q.  Uh-huh.
6  [redacted]
7  [redacted]
8      Q.  Um-hum.
9      A.  And the notes in our processing
10 software says, okayed by credit adviser.
11     Q.  Okay.
12     A.  Which leads me to believe the most
13 likely scenario, though, there is that that credit
14 adviser got a referral from Mr. Ensminger, and
15 [redacted]
16 [redacted]
17     Q.  Okay.  So --
18     A.  But I don't know that with certainty.
19     Q.  The approval from the credit adviser
20 would be that, yes, it's a legitimate referral, I
21 [redacted]
22
23     A.  No.  Yeah.  The credit advisers don't
24 approve or deny refunds.
25     Q.  Got it.  Okay.

Page 142

1  In any event, a billable event is what
2  I'm thinking of, and by billable event -- my
3  first -- you said there was no bill to the client,
4  no bill is processed to the client file until
5  something -- a trade line is deleted from a credit
6  reporting agency's report; correct?
7       A.   I wouldn't say deleted.  I wouldn't
8  use the word "deleted."
9       Q.   What word would you use?
10      A.   Corrected or removed along with
11 deleted.
12      Q.   Deleted, corrected, or removed?
13      A.   Um-hum.  Yes.
14      Q.   Okay.  All right.  So it's got to be
15 gone or fixed on their credit report?
16      A.   Yes.
17      Q.   And that would be the first -- is it
18 okay with you if I call it a billable event?
19      A.   Yeah.
20      Q.   Okay.  So when is the earliest
21 billable event you could get from the time that
22 you sign a client?
23           MR. HUDSON:  Object to the form of the
24 question.
25 [redacted]

Page 143

1-4 [redacted]
5       Q.   BY MS. WELLS:  Um-hum.
6       A.   That goes out.  Then we step back and
7  wait.
8            So to go back to our example before,
9  when we spoke about there's -- let's say if
10 there's only one item and we know that.  We
11 dispute, the bureaus get it, they process the
12 dispute, and they come back with an ADV of deleted
13 or verified or changed.
14           If we've got that back, now we can
15 verify through the credit monitoring, that, hey,
16 let's pull a fresh report.  We verified that we've
17 got a consumer monitoring report showing it was
18 there and now it's not.  We're going to generate
19 an invoice for that.
20      Q.   Okay.
21-25 [redacted]

Page 144

1       Q.   Okay.  Do you mean repaired or
2  removed?
3       A.   Deleted, corrected, or -- repaired and
4  corrected.  We would say the same thing.
5       Q.   Okay.
6       A.   Interchangeable, I guess.  Sorry.
7       Q.   That's okay.  I appreciate that.
8  The -- so based on your experience -- and the
9  standard way that the process works, I believe,
10 from what you've testified and Mr. Addleman
11 testified, when a consumer is onboarded, it will
12-17 [redacted]
18      A.   In some files, yes.
19      Q.   Is that the -- is that the norm?
20      A.   I would say that happens more times --
21 yeah, I would say that's the norm.
22-24 [redacted]
25      A.   Not to the bureaus, no.

Page 145

1       Q.   How are they sent to the bureaus?
2-6 [redacted]
7            MR. HUDSON:  Object to the form of the
8  question.
9       A.   It just depends.  If that's -- a
10 dispute gets processed at the bureau level and the
11 ADV goes out and Cap One, in the your example
12 before, replies right away, hey, you're seeing
13 that in two to three days.
14      Q.   BY MS. WELLS:  Okay.
15      A.   If Cap One chooses not to respond to
16 that or there's a lot of different things the
17 furnisher can do to delay that process, so you
18 just don't -- you just don't know.
19      Q.   Sure.  And I understand that can vary.
20 And I'm looking at the soonest these things can
21 happen.
22-24 [redacted]
25 And so that's going to take two to three days.

**Page 150**

1  Q.  BY MS. WELLS:  Can I ask you a few
2  more questions, and we'll take a break even before
3  noon?
4  A.  Sure.
5  Q.  Do you know when Mr. Ensminger's
6  credit card was charged the $300 for his retainer?
7  A.  I'd have to go back in and look at the
8  documents.
9      Do you have that?
10 Q.  I do have it.
11     What document specifically would you
12 look at to determine the date?
13 A.  The -- what was the question again?
14 Q.  When Mr. Ensminger's credit card was
15 charged.
16 A.  I can look at those documents and I
17 can tell you when the payment was input into our
18 system and then what day the payment was
19 scheduled.
20 Q.  Okay.
21 A.  I can't tell you with exact certainty
22 of when those funds came out of his account.
23 Q.  Sure.  But you know when -- when you
24 received the funds or when you processed payment
25 rather?

**Page 151**

1  A.  Yes.
2  Q.  Okay.  I'm going to give you what we
3  marked yesterday as Exhibits 8 through 11.
4  A.  Sure.
5  Q.  And you can let me know if any or
6  multiple of those answers your question.
7  A.  Based on these -- these notes --
8  Q.  If you could tell us which exhibit
9  we're looking at.
10 A.  I'm sorry.
11 Q.  That's okay.  Thank you.
12 A.  On Exhibit 8.
13 Q.  Okay.
14 A.  It doesn't have a page number, but the
15 first entry.
16 Q.  On the third page?
17 A.  On the third page, on 3/2/2015,
18 Loretta Hamilton input the $300 retainer.  Then on
19 3/9, Alicia posted that payment, and looks like
20 3/6, which was, I'm assuming probably a Friday --
21 Q.  Can I interrupt you and ask you to
22 tell us which exhibit you're looking at.
23 A.  On Exhibit 9.  This is a printout from
24 our accounting software that shows a history of
25 that.

**Page 152**

1  Q.  Okay.
2  A.  So on 3/6 it appears the payment was
3  ran, and then it was posted to our system on 3/9.
4  Q.  So if you can repeat for me when the
5  payment was ran.  It was on 3/2/2015?
6  A.  The retainer was ran -- no, the
7  retainer was data input into our system.
8  Q.  Uh-huh.
9  A.  Along with the rest of the contract on
10 3/2.
11 Q.  Okay.
12 A.  Which means the letters were
13 processed.
14     Then on 3/6 our accounting software
15 ran the retainer for $300.  Then in looking at the
16 invoice, the retainer was applied to the invoice
17 on 4/10.
18 Q.  Okay.  That explains the different
19 dates and helps very much.  Thank you.
20     So the retainer was actually ran on
21 3/6, March 6, 2015?
22 A.  Appears to be, yes.
23 Q.  And you're looking at which document
24 to --
25 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Page 153**

1  Q.  Okay.  And looking at -- back to
2  Exhibit 8, where it said -- you named someone by
3  the name of Loretta on page 3, or the third page.
4  A.  Yes.
5  Q.  Who is that?
6  A.  That would have been a processor.
7  Q.  Okay.  And does she work with CLC
8  anymore?
9  A.  No.
10     MS. WELLS:  We can take that break if
11 you want.  This is a good stopping point.  How
12 long do you guys need?  I'm happy to get through
13 as quick as we can today.
14     MR. HUDSON:  I think we are as well.
15     (Recessed from 11:45 a.m. to
16         12:35 p.m.)
17 Q.  BY MS. WELLS:  Go ahead and go back on
18 the record.
19     Mr. Thomas, I understand that the
20 contract for services has undergone some
21 non-substantive changes over the course of CLC's
22 time in business.
23     But I have a question whether or not
24 the operative form that's in existence at any
25 given time, even with the little minor changes, is

MARK ENSMINGER vs CREDIT LAW CENTER, LLC, ET AL.
Confidential        Bo John Lee Thomas on 12/10/2019        Pages 154..157

Page 154
1  the same one that's used for all clients who are
2  brought onboard at that time?
3      A.   For the credit repair process, yes.
4      Q.   Okay. Perfect.
5           Now, we're going to start looking
6  through some of the documents --
7      A.   Okay.
8      Q.   -- in more detail. I had put -- we
9  put them in order in front of you.
10     A.   Okay.
11     Q.   These were the documents that were
12 marked yesterday. If we keep them in order, it's
13 going to be a lot easier for you to find them as
14 we go through. A few documents we mark new, we'll
15 just put them at the end.
16          Is that okay with you?
17     A.   Yes. Sure.
18     Q.   Thank you.
19          I'd like to first look at what was
20 previously marked as Exhibit 2.
21     A.   Okay.
22     Q.   And if you could identify -- well,
23 take a look at all the pages of this document
24 first, and then identify that for me, if you can.
25     A.   Appears to be our credit repair

Page 155
1  services agreement --
2      Q.   Okay.
3      A.   -- with Mr. Ensminger, and there at
4  the end is a copy of the lender's report. The
5  lender he was using or -- yes, lender report. The
6  CBS invoice. Credit report.
7      Q.   You mean CLC?
8      A.   Yes. CLC. Did I say CBS? CLC, yes.
9      Q.   And this document was the operative
10 contract for services in use at the time that
11 Mr. Ensminger was retained?
12     A.   Yes.
13     Q.   Or that Mr. Ensminger retained CLC?
14     A.   Yes, ma'am.
15     Q.   And just for purposes of the record,
16 the first page of Exhibit 2, we will mark as
17 confidential, because it includes Social Security
18 number, date of birth information, which I
19 probably should have redacted, but I didn't.
20          Would this be the first interaction
21 that --
22          MR. HUDSON: Yeah, we missed that too.
23     Q.   BY MS. WELLS: -- plaintiff had with
24 CLC?
25     A.   Define interaction.

Page 156
1      Q.   Would this be the first time that
2  CLC -- anybody that worked on behalf of CLC met
3  with Mr. Ensminger?
4      A.   The credit repair agreement would not
5  have been the lender report, the credit report
6  that's provided at the end of this. Could have
7  been, but doesn't necessarily -- there's nothing
8  in our process that would institute that -- I
9  mean, say that with certainty --
10     Q.   Okay.
11     A.   -- the first interaction. There could
12 have been phone calls or emails prior to that.
13     Q.   All right. Do you know what date that
14 contract for services was executed with
15 Mr. Ensminger?
16     A.   Appears to be 2/27/2015.
17     Q.   Okay. And did you personally, as
18 Bo Thomas, have any interaction with
19 Mr. Ensminger?
20     A.   I don't recall ever speaking or
21 communicating with Mr. Ensminger, no, not that I
22 remember.
23     Q.   Okay. Do you know who with CLC
24 communicated with Mr. Ensminger?
25     A.   I could look back through the notes in

Page 157
1  one of the documents that were provided earlier,
2  [redacted]
3      Q.   Okay.
4      A.   -- to be able to indicate who had. I
5  know that -- or Ms. Paige White had. I know that
6  he ended up on the legal services side as well,
7  and I know that he had dealt with Mr. Keith
8  Wilson, one of our associate attorneys at the time
9  as well.
10 [redacted]
11 [redacted]
12 [redacted]
13 [redacted]
14     A.   No. No, not necessarily. The legal
15 side will review those from time to time, to see
16 if there's any pertinent information or anything
17 to be useful to them. But, no, the legal side
18 does not log in and participate in communications
19 or notes or utilizing that system at all.
20 [redacted]
21 [redacted]
22 CLC are going as they're designed to do, any
23 interactions with Mr. Ensminger would be reflected
24 in those notes?
25     A.   Any interaction with the staff is

MARK ENSMINGER vs CREDIT LAW CENTER, LLC, ET AL.
Confidential
Bo John Lee Thomas on 12/10/2019
Pages 186..189

Page 186

```
 1            MR. HUDSON:  You can answer the
 2   question.
 3            What services do you fully perform in
 4   the first seven days?
 5      Q.    BY MS. WELLS:  No.  I don't need you
 6   to go through everything again.
 7      A.    You asked me to go through everything.
 8      Q.    Do you want to go through it?  I'm not
 9   trying to beat up on you.  I'm just trying to get
10   answers to the question.  I feel they're really
11   direct questions.  I'm not trying to trip you up.
12   If you feel you're being tripped up, just answer
13   the question the best way you know how.  That's
14   all I can say.
15            So with respect to being fully
16   performed and processed, that does not include a
17   billable event; is that correct.
18      A.    If you're asking if we have a billable
19   event in seven days, no.
20      Q.    Okay.  That is part of what I'm
21   asking.
22            MR. HUDSON:  Object to the --
23      Q.    BY MS. WELLS:  But in terms of
24   collecting --
25            MR. HUDSON:  I object to the form of
```

Page 187

```
 1   that question.  I don't understand the question
 2   and what the answer was referring to.
 3            MS. WELLS:  That's fine.  That's fine.
 4   Okay, Tim.
 5      Q.    BY MS. WELLS:  So you're trying to
 6   distinguish between a charge taking place and a
 7   collection; is that fair to say?
 8      A.    I don't understand that.
 9      Q.    Okay.  I asked whether or not CLC,
10   under this contract, can or would charge a client
11   before April 7, 2015, and you said -- here's my
12   understanding of what you're saying.  I'm not
13   trying to trip you up.  So just listen really
14   carefully to what I'm saying.
15            You're saying in the first paragraph
16   that it's saying that you can charge up to the 300
17   on or after 4/7/15.  But in the next paragraph,
18   it's about something different.  It's about a
19   specific retainer, and you're saying you're
20   allowed to collect that within seven days of
21   signing the agreement?
22            So far are we on the same page?
23            MR. HUDSON:  No.  After -- seven days
24   after not within seven days.
25      Q.    BY MS. WELLS:  Okay.  Seven days after
```

Page 188

```
 1   the date of the contract.
 2            Is that correct?
 3      A.    I believe so.  I think it's being
 4   asked so many different ways, I don't even really
 5   understand it.
 6      Q.    If you don't understand it, let's make
 7   sure you understand it before you answer.
 8      A.    But I would like to finish and say,
 9   again, I feel like you're trying to blend two
10   paragraphs together and then excluding the
11   paragraph below, all of it that says, "For
12   example, if you authorize a payment of 500 in 35
13   days, and you have paid a $200 retainer, after we
14   have totaled up your results it comes to 450, then
15   we will deduct the 250 amounts or account and
16   continue working on your items.  If the total
17   exceeds 500, we will deduct the remaining 300, and
18   suspend any further work until the balance is
19   paid."
20            I don't understand what you're asking
21   about or what you're trying to clarify or what you
22   don't understand.
23      Q.    Well, what I don't understand is it
24   seems to me that you are distinguishing the
25   collection of the $300 retainer from a charge.  Is
```

Page 189

```
 1   that correct?
 2      A.    No.  What we are doing is seven days
 3   after the consumer signs a contract --
 4      Q.    Um-hum.
         [redacted]
12      Q.    Um-hum.
13      A.    40 days later, which would be on 4 --
14   35 to 40 days later --
15      Q.    Yes.
16      A.    -- which I believe it was on 4/10, we
17   verified the amount of items that were deleted for
18   the client.  Mr. Ensminger himself had plenty of
19   items deleted, and an invoice was generated.  His
20   $300 retainer was applied to that.  We did not
21   charge him $300.  We set him up on a payment plan,
22   and trying to word things to where some consumer
23   is confused or -- there's -- at no point in time
24   is your client even acted or asked any questions
25   about being confused about -- about any of this.
```

www.huseby.com                Huseby, Inc. Regional Centers                800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 190

```
 1   I don't understand -- I don't understand any of
 2   that at all.
 3        Q.   Okay.  And that's fine that you don't
 4   understand that.
 5             But my question is:  Is there a
 6   difference between the charge that CLC is allowed
 7   to make under this contract on 4/7/15, and the
 8   running the credit card on March 6th, 2015?
 9        A.   We collected the retainer on March --
10   I believe to be 6th.  Posted that payment on the
11   9th.
12        Q.   Okay.  So on March 6th, 2015, did you
13   charge the credit card?
14        A.   Yes.  There was a charge for the
15   collection of the retainer.
16        Q.   Okay.  Okay.  Looking at a couple
17   pages forward on Bates 45, do you see Mr. Tom
18   Addleman's signature on that page?
19        A.   Yes.
20        Q.   And is that on every form, contract?
21        A.   Tom Addleman's signature?
22        Q.   Yes.  Like on this form within every
23   contract, on the HIPAA form?
24        A.   On the HIPAA form, yes, I believe it
25   is.
```

Page 191

```
 1        Q.   Okay.  And he stated that he
 2   authorized that.  I'm just asking for purposes of
 3   understanding what these contracts include.
 4             So I understand -- and I know this is
 5   a hot button for you, but is there a difference in
 6   CLC's opinion between collecting money from a
 7   client and charging a client money?
 8             MR. HUDSON:  Object to the form of the
 9   question.
10        A.   Can you rephrase that or reword that?
11        Q.   BY MS. WELLS:  I can try.
12             Is -- do you see a difference in
13   charging a client money and collecting money from
14   a client?
15        A.   Huge difference.
16        Q.   Okay.  Excellent.  Tell me what that
17   difference is.
18   [redacted]
19   [redacted]
20   [redacted]
21   [redacted]
22   [redacted]
23   [redacted]
24   [redacted]
25   [redacted]
```

Page 192

```
 1   [redacted]
 2   [redacted]
 3   [redacted]
 4   [redacted]
 5   [redacted]
 6        Q.   I understand.  And that is exactly
 7   what I was trying -- I wasn't trying to trip you
 8   up.  That is exactly what I was asking for.
 9             So from a client's perspective in
10   making that payment, is there any difference from
11   their point of view in terms of, if I hand you
12   $500 and you say, I charged that, thank you, or I
13   collected that, thank you -- is there a different
14   impact on the client?
15             MR. HUDSON:  Object to the form of the
16   question.  Calls for speculation.  Vague and
17   ambiguous.
18        A.   I guess reword that.  I think I know
19   what you're asking, but I'm not for sure.
20        Q.   BY MS. WELLS:  Sure.  If I tell you
21   I'm going to charge you $500, and you hand over
22   $500, and I take it from you, is there a
23   difference in that between me saying, I'm going to
24   collect $500 from you, and you hand over $500, and
25   I take it from you?
```

Page 193

```
 1        A.   If you change the words in your
 2   question, I can probably answer it.
 3        Q.   What would you like me to change the
 4   words to?
 5   [redacted]
 6   [redacted]
 7   [redacted]
 8   [redacted]
 9   [redacted]
10        A.   Yes.
11        Q.   So if a retainer is subject to a
12   billable event, do you give the money back?
13        A.   It's a case-by-case basis.
14        Q.   Okay.  So in those circumstances,
15   maybe not?
16        A.   It would no longer be a retainer then,
17   and we would still refund it at times.
18        Q.   Okay.
19        A.   So I guess, to clarify that, if
20   somebody has a $300 retainer with us, and we have
21   a billable invoice of $500, they no longer have a
22   $300 retainer with us.  They have an outstanding
23   invoice, because the retainer's been applied to
24   the outstanding invoice, and they have an open
25   balance.  If for simple math somebody has a $300
```

Page 238

1  Q. Uh-huh. That's what I thought.
2     I think that was Bates 8. Mine are
3  not in order.
4  A. Yeah. Exhibit 9 --
5  Q. Okay.
6  A. -- is the accounting software.
7  [redacted]
8  [redacted]
9  [redacted]
10 [redacted]
11 [redacted]
12 card was ran on March 6th?
13 A. Yes.
14 Q. Okay.
15 A. It appears that the payment was
16 processed on March 6th.
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23 Q. It would show the date. Would it also
24 show the date of the first billable event?
25 A. No.

Page 239

1  Q. Okay. Where would you look to find
2  the first billable event for each of these?
3  [redacted]
4  [redacted]
5  [redacted]
6  A. Do you have 8 over there by chance, or
7  do I.
8  Q. I tried to put them in order.
9  A. I got them out of order earlier. I
10 apologize.
11 Q. Yeah. It's easy to do as we're
12 talking.
13 A. Okay. And what was your question?
14 Sorry.
15 [redacted]
16 where it tells the first billable event for
17 Mr. Ensminger, or do you look someplace else?
18 A. I would look at Exhibit 6.
19 Q. All right.
20 A. I believe -- wait. Oh, yes.
21 Q. Do you mean 6? This?
22 A. No, I'm sorry.
23 Q. That's okay.
24 A. Exhibit 7.
25 Q. Okay.

Page 240

1  A. Exhibit 7 is when the credit
2  monitoring credit report is pulled.
3  Q. Okay.
4  A. We document what items have been
5  deleted or corrected and what items remain and
6  generate an invoice, and that's when we apply the
7  retainer on that and account for everything.
8  Q. And what software do you use to do
9  that?
10 [redacted]
11 [redacted]
12 [redacted]
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17 A. Yes.
18 Q. Okay. And it shows that with respect
19 to Mr. Ensminger that it was -- the fist billable
20 event was April the 9th; is that correct?
21 A. That shows when the invoice was
22 created.
23 Q. Okay.
24 A. So billable events doesn't happen
25 necessarily when the invoice is created. That's

Page 241

1  just when we verify it.
2     So, for example, if Mr. Ensminger sent
3  in his bureau responses to us prior to 4/7 or
4  4/10, and we've got a bureau response that says
5  deleted updated, no longer reporting, we then
6  would move forward with pulling a credit report,
7  verifying it's not there, see if his goals are not
8  met, generating an invoice, we would consider it
9  billable then.
10 Q. Okay.
11 A. None of that happened in this
12 particular case, because I don't believe we had
13 the responses in time or for the consumer, to say,
14 hey, I'm ready, I've got an item deleted. But it
15 wouldn't be correct in saying the first billable
16 event was 4/10.
17 Q. Okay.
18 A. That's just to say that's when the
19 invoice was generated, and then the retainer was
20 applied to the invoice.
21 Q. Okay. Do you know whether the first
22 billable event was for Mr. Ensminger in this case?
23 A. In this case, our first billable
24 event, what we viewed as a billable event based on
25 your documentation, was 4/10.

**Page 246**

1  Repair Organization Act.
2      Q.   Right.
3      A.   So that is every client that came in.
4  The vast majority on that list didn't have a
5  retainer.
6      Q.   Sure. And so you know that was broken
7  down by tab. The claims related to, like, the
8  cancellation and stuff were dismissed. So we did
9  not include that in any of our exhibits today.
10     A.   Okay.
11     Q.   So this is only the tab. One of the
12 tabs included everyone that had a retainer. And I
13 think it was called Retainer, the tab.
14         MR. HUDSON: That's probably right.
15         MS. WELLS: Exactly.
16     Q.   BY MS. WELLS: So would everybody
17 under the Retainer tab be absolutely everybody
18 that had a retainer with the CLC since it opened
19 up to August 12th, 2019?
20     A.   That list would be compiled of
21 everybody that agreed to a retainer.
22     Q.   BY MS. WELLS: Uh-huh.
23     A.   It would not be a list of everybody
24 that paid a retainer because not all people were
25 not successful in collecting a retainer.

**Page 247**

1      Q.   I understand. And we discussed a
2  moment ago how you could confirm whether or not
3  they actually had a retainer. You would have to
4  go and look, because some people paid it late or
5  didn't pay at all or it didn't go through; right?
6      A.   Correct.
7      Q.   So this document, when broken down --
8  well, first of all, it starts March 17th, 2014.
9          Is that when CLC actually opened its
10 doors to clients?
11     A.   Yes, I believe so.
12     Q.   Okay. And the information on the
13 column headings, do these have any meanings that
14 are different from those that you identified in
15 the prior exhibit?
16     A.   No.
17     Q.   Okay. And do you have any knowledge
18 or information about the total amounts that were
19 actually paid by these clients?
20     A.   Any information?
21     Q.   Do you know how much these clients
22 paid, for example, in 2014?
23     A.   No.
24     Q.   Okay. Do you know how many clients
25 there were with retainers in 2014, without going

**Page 248**

1  through and counting them?
2      A.   No, I don't have that specific
3  number --
4      Q.   Okay.
5      A.   -- to memory.
6      Q.   But it would be -- I mean, the
7  document, in that sense, would speak for itself,
8  because it's everyone?
9      A.   Everyone that agreed to a retainer in
10 2014.
11     Q.   Gotcha.
12         MR. HUDSON: But, to be clear, it's
13 everyone who agreed to a retainer, not everyone
14 who paid a retainer. That would be a lesser
15 number.
16     Q.   BY MS. WELLS: I understand. Yes.
17 You testified to that just a few minutes ago.
18 Yes, I do understand that.
19         All right. I think you've actually
20 answered the question on that document.
21         I'm going to ask you to look at
22 Exhibit 6.
23     A.   Okay.
24     Q.   All right. And in looking at this
25 document, can you identify what this is for me?

**Page 249**

1  [redacted]
2  [redacted]
3  and a comparison of a before and after of the
4  original credit report and the most recent credit
5  report or the previous credit report. Appears
6  there's only been one in this. So this is the
7  audit on 4/10, where our staff updated the
8  consumer credit report, verified what items were
9  deleted or repaid, and what items were made.
10     Q.   Okay. And does this document have a
11 name? Do you guys refer to it by anything?
12     A.   Update.
13     Q.   Okay. And on this update, it looks
14 like -- it says "To Do: 25." What does that
15 mean?
16     A.   That means that there are still 25
17 items to continue to work on.
18     Q.   Okay.
19     A.   If the consumer chooses to continue
20 forward.
21     Q.   Okay. And six items had been deleted;
22 is that correct?
23     A.   Yes.
24     Q.   All right. And does that mean in the
25 very beginning, when they went through his report

Page 274

```
 1  And it's going to be Exhibit 32, and it's
 2  Bates 265.
 3              (Exhibit 32 marked.)
 4       A.  Okay.
 5       Q.  BY MS. WELLS:  Do you know what
 6  this -- is this an email?
 7  [REDACTED]
 8  [REDACTED]
 9  [REDACTED]
10  [REDACTED]
11  [REDACTED]
12  [REDACTED]
13  [REDACTED]
14  [REDACTED]
15            And a lot of my past clients or past
16  contacts from my previous professional career
17  comes from that.
18  [REDACTED]
19  [REDACTED]
20  with anybody that's not compliant.  And asked
21  if -- he's asking -- or this is my reply to -- I'm
22  assuming my reply is to explain how we're
23  compliant and why.
24       Q.  Okay.  All right.  In case you do
25  future business with him, I presume?
```

Page 275

```
 1       A.  Yeah.  Yes.  We --
 2       Q.  Okay.
 3       A.  And we do.
 4       Q.  All right.  I want to take just about
 5  5 minutes to look over my notes.  If you guys want
 6  to take a quick break during that time and then
 7  come back.  I think we're going to be done, but
 8  you're welcome to take a break.
 9            MR. HUDSON:  Yeah.  Let's take five,
10  and we'll do that as well.
11            (Recessed from 3:10 p.m. to
12            3:20 p.m.)
13            MS. WELLS:  Sir, I have no further
14  questions for you.  I appreciate it.
15            THE DEPONENT:  Oh, okay.
16            MR. HUDSON:  I just have a couple.
17            MS. WELLS:  Okay.
18                  EXAMINATION
19  BY MR. HUDSON:
20       Q.  Mr. Thomas, you were asked some
21  questions earlier today about how retainer --
22  retainers that are collected by CLC are accounted
23  [REDACTED]
24  [REDACTED]
25       A.  Correct.
```

Page 276

```
 1       Q.  And what do you mean by that?
 2  [REDACTED]
 3  [REDACTED]
 4  [REDACTED]
 5  [REDACTED]
 6  [REDACTED]
 7  [REDACTED]
 8  just unearned.
 9       Q.  And has -- before a retainer is
10  collected, has Credit Law Center fully performed
11  any of its services?
12       A.  Yes.  Everything happens well before
13  that retainer is collected.  And the reason we
14  have the minimum of the seven-day waiting period
15  or a hold before that's scheduled.
16       Q.  And you testified about what those
17  services are earlier in your deposition; correct?
18       A.  Correct.
19       Q.  And are there instances in which a
20  billable event has occurred before that seven-day
21  period of time has lapsed, where, for instance, a
22  client or Credit Law Center is informed that an
23  item on a credit report has or will be deleted?
24       A.  Yes.  And that is often.  The main
25  delay in the notification of an item being deleted
```

Page 277

```
 1  is, when there's several, but if there are
 2  specific accounts or a single account we're going
 3  after, a lot of those happen before that seven-day
 4  event.  And what we do, when we collect the
 5  retainer, we consider a billable event not always
 6  40 days or 35 days.  It's when we have got
 7  communication from the consumer that we got a
 8  deletion, and we consider -- you know, any time
 9  we've got documented success, we'll do that prior
10  to that 40th day.
11            And then we'll generate an invoice,
12  and that's that billable event we speak of, from
13  being able to document something's been deleted.
14       Q.  You recall that you were asked some
15  questions about certain sections of the credit
16  repair agreement that Credit Law Center has with
17  its clients.
18            And some of the questions you were
19  asked were concerned with the section that relates
20  to the date on or after which Credit Law Center is
21  authorized to apply certain -- take certain
22  charges from a client's credit card.
23            Do you recall that?
24       A.  Yes.
25       Q.  Can CLC send an invoice to a client
```

Page 278

1  before the date that's reflected in the contract
2  authorizing CLC to charge the credit card?
3     A.   Yes.  Again --
4     Q.   Under what circumstances?
5     A.   That same circumstance just described,
6  but to redescribe that, if we had the bureau
7  responses back, if we've got a response from the
8  debt furnisher that has went to the consumer that
9  says we've investigated the item, the item's being
10 removed, or if we've got a good understanding
11 having a likelihood that the items are removed,
12 then absolutely.  We will then update the credit
13 report or adjust it based on information we have,
14 create an invoice, and call the consumer and go
15 over that.
16    Q.   And so that's something that could
17 happen before the date that's reflected in the
18 contract, but that would be based upon individual
19 communications with individual consumers?
20    A.   Yes.  Once those consumers start to
21 send those responses in, if we feel like they've
22 met their goal or there's a likelihood of that
23 happening, absolutely.  All of those get escalated
24 because the consumers are wanting to try to get
25 through this process as fast as possible.

Page 279

1     Q.   And as you sit here based on your
2  experience at Credit Law Center, have those types
3  of situations, in fact, occurred before?
4     A.   Yes.
5          MR. HUDSON:  That's all I have.
6          MS. WELLS:  Okay.  I do have a few
7  follow-up questions as you may have guessed.
8          THE DEPONENT:  Okay.
9               EXAMINATION
10 BY MS. WELLS:
11    Q.   You testified that you fully performed
12 some services before the retainer is collected in
13 a lot of cases.
14         And you testified or your attorney
15 asked and you confirmed that it's a lot of what
16 you testified about earlier.
17         And I believe what you're talking
18 about is that initial consultation with a credit
19 adviser to give them advice and walk them through
20 their credit report, and to send out the letters
21 to the processors.
22         Is that what you're referring to?
23    A.   Yes.
24    Q.   Okay.  Is it true, however, that none
25 of those events on the first -- well, none of

Page 280

1  those events that I just mentioned are billable
2  events?
3     Q.   Those aren't services that CLC charges
4  for; correct?
5     A.   We don't charge for advice or we -- we
6  base our fees based on success.
7          So the work that we provide is based
8  on -- and our fee is based on the success.  It's a
9  performance based.
10    Q.   Right.  And I think you testified
11 pretty clearly to that before.
12         So just to make it crystal clear for
13 the record, the only billable event, or the only
14 service that CLC charges for is the deletion or
15 removal of information or correction on a credit
16 report; correct?
17    A.   Correct.
18    Q.   Okay.  And you also testified that
19 often there will be a billable event when, for
20 example, just one trade line is disputed.
21         Is that what you just testified to
22 your attorney?
23    A.   I had testified that a lot of times
24 when there is just one item going after things
25 move much, much faster.

Page 281

1     Q.   Okay.  So you might actually even have
2  a billable event in that scenario before that
3  seven days passes to process the retainer; is that
4  what you mean?
5     A.   What I mean is that there could be a
6  billable event on day one, day two, based on
7  documentation of the removal.  And if we've got
8  proof that we've had success, then we would create
9  an invoice, call the consumer, go over that
10 invoice, and collect that payment.
11    Q.   Okay.  So in that case, a retainer, if
12 there were to be one, would never have even been
13 charged yet; correct?
14         MR. HUDSON:  Object to the form of the
15 question.
16    A.   We wouldn't, in those situations,
17 because if it's just one item, you're not going to
18 see a retainer.
19         And then if you've got multiple items,
20 I believe that we're still getting deletions
21 inside of that five, six, seven-day window.  We're
22 just not getting documentation back from the --
23 either be a consumer report from the bureaus to
24 the consumer or a letter from the furnisher to the
25 consumer, even though it could be happening or