**In the United States District Court
for the District of Kansas**

———————

Case No. 19-cv-02147-TC-JPO

———————

MARK ENSMINGER,

*Plaintiff*

v.

CREDIT LAW CENTER, LLC, ET AL.,

*Defendants*

———————

**MEMORANDUM AND ORDER**

Plaintiff Mark Ensminger alleges that Defendants Credit Law Center, LLC and Thomas Addleman (collectively CLC) violated 15 U.S.C. § 1679b(b) of the Credit Repair Organizations Act (CROA). Doc. 148 at 7. Ensminger moves to certify a class of CLC customers under Fed. R. Civ. P. 23(b)(3). *Id.* at 6. For the following reasons, the motion, Doc. 144, is granted.

**I**

**A**

The parties' pleadings implicate two concerns: standing and class certification. One affects judicial power over this dispute and the other the propriety of dealing with the class-based claims pursuant to Rule 23.

**1.** Standing is a predicate for class certification. *Vallario v. Vandehey*, 554 F.3d 1259, 1269 n.7 (10th Cir. 2009). Standing exists at the class certification stage when at least one named plaintiff meets the requirements of Article III, which limits federal courts to hearing "cases or controversies." U.S. Const. art. III, § 2; *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010). Unnamed plaintiffs in the proposed class need not demonstrate Article III standing. *Colorado Cross*

1

*Disability Coalition v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214 (10th Cir. 2014).

Article III standing requires a plaintiff have "suffered an injury in fact" that is "fairly traceable to the challenged action of the defendant," and is likely to be "redressed by a favorable decision." *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The injury-in-fact must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.

**2.** If standing is demonstrated, Rule 23 analysis is the next step. Class actions are exceptions "to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). A plaintiff meets that exception when he or she satisfies Rule 23. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). If the prerequisites of Rule 23(a) are met—numerosity, commonality, typicality, and adequacy—a claimant then must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* The movant bears the burden of demonstrating that the Rule 23 requirements are met. *See D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

Where, as here, Rule 23(b)(3) is invoked, it must be determined that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). Individual questions require "members of a proposed class…to present evidence that varies from member to member," whereas with common questions "the same evidence will suffice for each member" such that "the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 William B. Rubenstein, *Newberg on Class Actions* § 4:50 (5th ed. 2012)).

**B**

In March 2019, Ensminger filed a class action complaint against CLC alleging three distinct violations of CROA and breach of a

fiduciary duty owed to Ensminger and the putative class. Doc. 1 at 1.[1] CLC responded with a motion to dismiss. Doc. 19. In part, CLC argued that Ensminger lacked standing because he did not suffer a concrete injury from the purported CROA violations or breach of fiduciary duty. Doc. 19 at 1, 3–8; *see also* Doc. 33. Two of the three claims were dismissed for lack of standing or failure to state a claim. Doc. 44 at 9–17.

In the remaining count, Count I, Ensminger alleged that CLC charged or received money before fully performing its services for Ensminger and putative class members in violation of CROA, 15 U.S.C. § 1679b(b). Doc. 45. That provision prohibits credit repair organizations from receiving payments from customers in advance. In relevant part, it reads: "No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b). Judge Lungstrum, then presiding over this dispute, rejected CLC's standing argument, concluding "that the loss of the time value of money that was paid before it should have been" was a concrete injury. Doc. 44 at 4; *see also* Doc at ¶ 52.

At the close of discovery, CLC moved again to dismiss Count I, on the grounds that Ensminger "exchanged [his time value of money] for valuable services that were rendered before the payment was made," suggesting Ensminger lacked Article III standing because he suffered no aggregate harm. Doc. 132 at ¶ 6. That motion, Doc. 132, was orally denied at a hearing in October 2021. Doc. 160. Shortly thereafter, Ensminger filed a motion to certify a class on Count I. Doc. 144.

The parties agree, as a factual matter, that CLC is a credit repair organization that charges customers for services designed to remove negative entries on their credit reports. Doc. 148 at 7; Doc. 171 at 11. They also agree that Ensminger entered into a standard Engagement Agreement with CLC sometime prior to March 2015. Doc. 148 at 7; Doc. 171 at 12. The Engagement Agreement contains the following relevant language:

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF. All facts are uncontroverted unless otherwise specified.

3

> In the event a retainer has been paid, there will be a credit on the first invoice for the retainer amount. Other than the retainer, I understand that I will only be charged after Credit Law Center document [sic] that the negative items were repaired or removed from my credit reports.

Doc. 144-3 at 4–5.

In broad strokes, CLC's credit services are provided in three steps. First, CLC performs a free consultation. Doc. 171 at 28; Doc. 178 at 12. During or after the initial consultation, clients sign an Engagement Agreement. Doc. 171 at 28. Then, within 24 hours, CLC evaluates line items on the client's credit report and sends dispute letters to third-party credit bureaus disputing the challengeable entries. Doc. 171 at 23, 28. The third step—requesting payment—occurs only if CLC receives an updated credit report and verifies that challenged items were removed. Internally, CLC refers to this occurrence as a "billable event." *E.g.,* Doc. 148–1 at 14. After a billable event, CLC generates an invoice and requests payment, on a per deletion basis. Doc. 171 at 30; Doc. 178 at 33. Billable events can occur anywhere between a few hours and 14 days after CLC sends dispute letters, depending on when CLC verifies removal. Doc. 171 at 31. CLC's standard practice is to generate an invoice the same day a "billable event" occurs. Doc. 148 at 8.

For clients who seek more than $500 in deletions or corrections, CLC's "general policy," according to Ensminger, is to charge a retainer fee, which is applied towards any final charges when CLC verifies deletion, i.e., when a "billable event" occurs. Doc. 147 at 7. Until a "billable event" occurs, CLC records the retainer on its internal accounting software as a credit on a client's account. Doc. 148 at 19; Doc. 178 at 12, 25.

The dispute driving the parties' major disagreement at this stage of the proceedings concerns the legal effect of Ensminger's payment under the CROA. And that dispute concerns not the amount or even necessarily the date of payment. Instead, the dispute is when, as a matter of law, CLC's services were fully performed. CLC contends that it fully performed its obligations on March 4, when it prepared and sent dispute letters challenging specific items in Ensminger's credit report. Doc. 171 at 12. But Ensminger contends that CLC's performance was not completed until more than one month later when the first "billable event" occurred on April 10, the day CLC generated a $485 invoice for

4

removing six negative entries from Ensminger's credit report. Doc. 148 at 8. For the purposes of this motion, Ensminger's contention as to what the CROA permits is accepted as true because CLC's argument goes to the merits of whether the claim is viable under the CROA. Merits arguments, which is what CLC is making, are not appropriate at this stage. *Amgen Inc.*, 568 U.S. 455, 466 (2013); *see also Black v. Occidental Petroleum Corp.,* 69 F.4th 1161, 1174 (10th Cir. 2023).

## II

Ensminger's motion to certify is granted. Ensminger has Article III standing because he alleges that CLC caused him to lose the time value of his money for nearly a month when he paid $300 to CLC in violation of the Credit Repair Organizations Act (CROA), 15 U.S.C. § 1679b(b). And, accepting that allegation, his proposed class satisfies the four Rule 23(a) factors as well as the predominance and superiority requirements of Rule 23(b)(3).

### A

CLC first asserts that class certification should be denied because Ensminger lacks Article III standing. That argument fails. *See also* Doc. 44 (rejecting CLC's standing argument).

In the class certification context, standing exists if at least one named plaintiff meets the requirements of Article III. *DG ex rel. Stricklin v. Devaughn,* at 1198 (10th Cir. 2010).[2] The parties concede that the alleged misconduct is attributable to CLC and that it would be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). But CLC contests Ensminger's ability to establish an injury-in-fact, asserting that he received fair value, suffered, if anything, a *de minimis* injury, and lacks a claim under the statute. Doc. 171 at 6–10.

---

[2] On rare occasions, standing need not be addressed at the class certification stage. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 66–67 (1997) (declining to address standing because mootness issue was dispositive) and *Amchem Prod., Inc. v. Windsor*, 521 U.S. 612–13 (1997) (declining to resolve standing where standing issue was created by novel class settlement proposal). This is not one of those occasions.

5

It is true that identifying a simple statutory violation is insufficient to establish standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) (emphasis in original). Instead, plaintiffs asserting a statutory violation must show some "physical, monetary, or cognizable intangible harm traditionally recognized" by courts to have a concrete injury. *Id.* at 2206.

But Ensminger has done more than identify a simple statutory violation. He has produced largely uncontested evidence that CLC required payment from him in March of 2015. Doc. 178 at 10. As CLC's CEO, Bo Thomas, explained, Ensminger's $300 retainer "ran" in CLC's "accounting system" on March 6 and "was posted to [its] system" on March 9. Doc. 148-1 at 10. And in a signed affidavit Thomas stated, "On March 9, 2015 … CLC received the $300 payment that is the subject of the only remaining claim in this lawsuit." Doc. 171-2 at ¶ 11. There is no dispute that CLC created an invoice on April 10, 2015, upon confirmation that six negative entries had been removed from Ensminger's credit report. Doc. 171 at 12–13. Accepting as true for the purposes of this motion that the CROA precluded CLC from accepting any payment before April 10, 2015, the evidence is sufficient to establish that Ensminger suffered a lost time value of money between March 6, 2015, and April 10, 2015. *Manley v. Fong*, 734 F.2d 1415, 1418 (10th Cir. 1984) (facts related to standing, as they are jurisdictional in nature, must be proved by a preponderance of the evidence at any stage beyond a motion to dismiss); *see also Lujan*, 504 U.S. at 561 (noting that a plaintiff's burden of proof regarding standing varies depending on the stage of litigation).

The lost time value of money, no matter how miniscule, constitutes a concrete injury-in-fact. *Contra* Doc. 171 at 17–19. It is an economic harm, precisely the type of injury long held to be the "epitome" of concrete. *See Craig v. Boren*, 429 U.S. 190, 194–95 (1976) (collecting cases); *MSPA Claims 1*, 918 F.3d 1312, 1318 (11th Cir. 2019) (lost time value of $268 over several months satisfies concreteness analysis); *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018) (finding concrete injury "because unauthorized withdrawals from [plaintiffs'] accounts cause a loss (the time value of money)); *Van v. LLR, Inc.*, 962 F.3d 1160, 1163 (9th Cir. 2020) (finding the reasoning of *MSPA* and *Dieffenbach* persuasive).

CLC makes several contrary arguments. All fail. CLC's primary argument is that Ensminger suffered no injury because he ultimately received more value ($390 worth of debt deletion services or alternatively $925 of erroneous debt deleted from credit reports) than he lost ($300 dollars). Doc. 171 at 17–18. But concreteness is not related to the value of consequential damages ultimately received. *Cf. MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019). The basis of Ensminger's standing claim is not that he failed to receive fair or full value. It is that CLC charged him $300 before it was statutorily permitted to do so and thereby deprived him of the use of his funds. Accepting for the purposes of this motion that Ensminger's view of what the CROA permits is accurate, that contention is sufficient for purposes of standing.

Next, CLC relies on *TransUnion* to assert that Ensminger's lost time value of money is not equivalent to a traditionally recognized basis for a lawsuit. Doc. 171 at 19. But it is: *TransUnion* explicitly states concrete injuries include "physical, monetary, *or* cognizable intangible harm[s] traditionally recognized." *TransUnion v. Ramirez*, 141 S. Ct. 2190, 2206 (2021) (emphasis added). Ensminger's loss of the use of money is an economic injury, not an intangible harm. *MSPA Claims 1*, 918 F.3d at 1318; *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018); *Van v. LLR, Inc.*, 962 F.3d 1160, 1163 (9th Cir. 2020); *see generally Craig v. Boren*, 429 U.S. 190, 194–95 (1976) (outlining economic injury). So, *TransUnion's* "traditionally recognized" test has been met since economic harms are "traditionally recognized." *See MSPA Claims 1*, 918 F.3d at 138.

Then, CLC argues that Ensminger's harm—the time value of $300 over the course of approximately a month—is so miniscule that it does not constitute injury-in-fact. Doc. 171 at 19. This is because, according to CLC, Congress did not intend to allow recovery pursuant to CROA for *de minimis* injuries. *Id.* There are several problems with this argument. First, as noted, Ensminger's alleged injury is economic, something *TransUnion* recognized is sufficient for purposes of standing. *TransUnion*, 141 S. Ct. at 2206. Second, CLC points to no statutory basis for its belief as to what Congress intended. Courts are required to apply the law as enacted, *Barton v. Barr*, 140 S. Ct. 1442, 1454 (2020), not attempt to divine the collective intent of the bicameral legislative bodies that passed a bill that was signed into law by the President. *See generally Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907–08 (2019) (recounting the perils of courts attempting to identify and enforce

unenacted legislative purposes); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 391–96 (2012) (exploring the fallacy of attempting to divine the legislature's intent). The legal task is to discern the meaning of the words used in the statute that has been enacted. *See Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1750 (2020). Third, the standing analysis is only concerned with whether Ensminger suffered an economic injury, not the amount or extent of that injury. *See MSPA Claims 1*, 918 F.3d at 1318.

Finally, CLC argues that Ensminger lacks standing because he suffered no injury under the statute as CLC "fully performed" by March 4, meaning Ensminger never lost the time value of his money. But what "fully performed" means in Section 1679b(b), and therefore whether CLC fully performed by March 4 (or if instead April 10 is the date CLC fully performed) is a disputed merits question. And merits questions are irrelevant to statutory standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92 (1998) (whether EPCRA includes a right of action for past violations "goes to the merits and not to statutory standing."); *see also Nw. Airlines, Inc. v. Cnty. of Kent, Mich.*, 510 U.S. 355, 365 (1994) ("The question whether a federal statute creates a claim for relief is not jurisdictional").

**B**

Invoking Federal Rule of Civil Procedure 23(b)(3), Ensminger seeks certification of his case as a class action. He identifies the class as follows: "All individuals who entered into CLC's Engagement Agreement, paid a retainer to CLC, and subsequently received an invoice generated after the date of their retainer payment." Doc. 148 at 11. Contrary to CLC's contentions, that request is proper.

**1.** A class action is proper only if the putative class is so numerous that it would be impracticable to join all members in a single action. Fed. R. Civ. P. 23(a)(1). In addition to promoting efficiency, the numerosity requirement safeguards individual due process rights, balancing the presumption that an individual has a due process right to press his or her own claim with the challenges of adjudicating numerous similar claims. 1 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 3:11 (6th ed. 2022).

A plaintiff seeking class certification therefore must justify why joining individual claims is impracticable under the circumstances. Rubenstein § 3:11. Impracticability is not impossibility—a plaintiff need

only show that joinder would be "extremely difficult or inconvenient." Rubenstein § 3:14. Determining whether joinder is impracticable is a "fact-specific inquiry that considers the nature of the action, the size of the proposed class, the location or geographic dispersion of class members, and whether members' names are easily ascertainable." *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) (citation omitted). And since Rule 23 is more than a pleading standard, arguments for numerosity must be supported by evidence. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

Ensminger establishes numerosity. He asserts that there are 17,296 individuals who meet the objective criteria for inclusion within the proposed class based on expert analysis of CLC's internal software. Doc. 148 at 13; *see also* Tr. 4:16-21, May 24, 2022. Regardless of where those 17,296 individuals are located, that is sufficient. Joinder of such a large number of individuals would be impractical. *Cf. Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.,* 765 F.3d 1205, 1215 (10th Cir. 2014) (joining the many thousands of disabled persons who patronized Hollister stores would be impractical).

CLC does not dispute that joinder of 17,296 individuals is impractical. Instead, it argues that the number is inflated because the proposed class includes many possible plaintiffs who do not have a viable claim under the statute. Doc. 171 at 22 (citing to *Otto v. Abbott Laboratories, Inc.*, No. 5:12-CV-01411, 2015 WL 12776591 (C.D. Cal. Jan. 28, 2015)). In essence, CLC claims neither Ensminger nor the proposed class will be able to establish a violation of CROA because the identified conduct is not precluded by the statute. But that is an argument that goes to the merits of Ensminger's claim and may be addressed in an appropriate motion, such as a motion for summary judgment. It is not something that can be considered at the time of class certification. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."); *see also Black v. Occidental Petroleum Corp.,* 69 F.4th 1161, 1174 (10th Cir. 2023) (citing *Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009)).

**2.** Rule 23 also requires a question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). This means that the claims of the putative class "must depend upon a common contention" that is "of such a nature that it is capable of class wide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350 (2011). In other words, the "determination of its truth or falsity will resolve an issue that is central to the validity of

9

each one of the claims in one stroke." *Id.* A plaintiff must show at least one such contention: "[e]ven a single [common] question" will do. *Dukes*, 564 U.S. 338, 359 (internal quotation marks omitted).

Ensminger raises four purported common questions. They are: Whether CLC qualifies as a credit repair organization under CROA; whether CLC received money for repair services when it collected class members' retainers; whether CLC received payment before fully completing its services; and whether CLC's practice of collecting retainers violates CROA's prohibition on payments in advance. Doc. 148 at 16. All are questions common to the entire proposed class, resolution of which would drive resolution of this case. Each boils down to a matter of statutory interpretation that can be resolved for the entire proposed class at once. That is the essence of what it means for a question to be common to the class. *Dukes*, 564 U.S. at 350.

Nevertheless, CLC denies commonality. Its main argument is that "[w]hen CLC collected a retainer is not common to all class members," because there are a "wide array of dates" on which CLC collects retainers, ranging from fewer than seven days to more than twenty-eight days after clients sign an Engagement Agreement. Doc. 171 at 27. It may be true that the dates of collection regarding retainers vary. But Ensminger's class only includes people who paid their retainer before being invoiced. Document 144-7. So long as that date is after the payment of the retainer (and it is for each class member), the legal question of whether that violates CROA remains common. That is sufficient. *Cf. Daye v. Cmty. Fin. Serv. Centers, LLC*, 313 F.R.D. 147 (D.N.M. 2016).

CLC also disputes Ensminger's use of the "billable event" as the pertinent date. It contends this is a substantively irrelevant marker that finds no home in "the plain language of CROA." Doc. 171 at 30. Once again, that contention is a dispute that goes to the legal viability of Ensminger's claim. It is not appropriate at the class certification stage. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. at 466.

Finally, CLC asserts that some (but not all) putative class members lack standing, which creates a serious, threshold question which is "not common to all potential class members." Doc. 171 at 32. That concern matters not at this stage of the proceeding. When it is time to certify the class, only the named plaintiff must demonstrate standing. *Colorado Cross Disability Coalition v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214 (10th Cir. 2014). Unnamed and as-yet uncontacted potential class members cannot be expected to show standing before they even know

they might be involved in class litigation. Even assuming some putative class members will have unique standing issues that are not common to the class, that does not mean there are no common questions in the class. It merely means that standing is not one of them.

*Cordoba v. DirectTV, LLC*, 942 F.3d 1259 (11th Cir. 2019), does not help CLC. *Contra* Doc. 171 at 32. To begin, *Cordoba* dealt with Rule 23(b), not 23(a). *Id.* Even so, the Eleventh Circuit held that class certification would be improper when a large tranche of unnamed class members could not show traceability and as such, "individualized issue[s] of standing" would predominate, 942 F.3d at 1271 (11th Cir. 2019), but CLC has pointed to nothing that suggests a large portion of the proposed class lacks standing. In fact, the opposite seems to be true because all putative members paid a non-zero retainer before they allegedly should have and that deprived them of the use of their money.

**3.** To satisfy Rule 23(a)(3), the claims of the representative plaintiff must be typical of the claims of the proposed class. Fed. R. Civ. P. 23(a)(3). But "the interests and claims of named plaintiffs and class members need not be identical." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010). So long as their claims are "based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality." *Id.* at 1998–99.

Ensminger's claim and those of the proposed class are based on the same legal theory: "that their retainers are precisely the type of illegal advance fee prohibited by [CROA]." Doc. 148 at 14. Relief for Ensminger and the class, all of whom, by virtue of their class membership, paid a retainer before they received an invoice, would flow from that legal theory being correct. As such, Ensminger's claim satisfies the typicality requirement in Rule 23(a)(3).

To defeat typicality, CLC raises the possibility that credibility challenges which implicate "circumstances unique to Plaintiff" will become the litigation's focus.[3] Doc. 171 at 33. These include Ensminger's "belief that he did not sign an Engagement Letter with CLC, his admission

---

[3] CLC repeats some of its arguments regarding commonality in seeking to defeat typicality, e.g., that the dates of retainer payment and "billable events" vary and require individual inquiry. These arguments fail for the reasons outlined above.

11

that CLC's services resulted in negative items being removed from his credit report[s] and his credit score improving." Doc. 171 at 33. CLC adds that Ensminger's belief that CLC continues to deprive him of the time value of money also separates him from the class. *Id.*

CLC's contention that Ensminger did not believe he signed an Engagement Letter with CLC is a slight, but meaningful, deviation from the factual record. According to Ensminger's deposition, he said it was "safe to assume" he signed an agreement with CLC, even though he had "strong doubts" that the exhibit presented at his deposition was the agreement he signed because of prominent mistakes in the spelling of his last name. Doc. 171-7 at 7. Nothing about that suggests a credibility issue, especially since CLC's internal records seem to indicate that Ensminger signed an agreement prior to March 4.

CLC argues that Ensminger misunderstands his case because he answered yes in response to the question "so you believe you are currently without the time value of the money at issue in this litigation." Doc. 171-7 at 5. This statement could easily reflect Ensminger's belief that he has not yet been compensated for the injury incurred between March 6 or 9 and April 10. And Ensminger's response shows a grasp of the idea that if he succeeds, CROA would require that his damages include his $300 retainer (rather than the time value of money he lost) because CROA allows the recovery of either actual damages or the amount paid to CLC, whichever is higher. 15 U.S.C. § 1679(g). Most importantly, where credibility issues do not rise to the level of conflicts of interest, they are largely irrelevant to Rule 23(a). *See Colorado Cross-Disability Coal. v. Abercrombie & Fitch Co.*, No. 09-CV-02757-WYD-KMT, 2012 WL 1378531, at *6 (D. Colo. Apr. 20, 2012), *aff'd,* 765 F.3d 1205 (10th Cir. 2014).

CLC raises several further typicality arguments. First, CLC contends that the order of services and payment is non-uniform across CLC clients and would require individualized inquiries. This is because some CLC clients may receive bespoke services and refunds of their retainer, something Ensminger did not receive. Doc. 171 at 29. But those who received a refund for their retainer are not within the factual contours of the proposed class. Doc. 148-1 at 14–15. Furthermore, CLC has not shown that clients with bespoke services form a large portion of the proposed class since the class members are factually defined as having signed an Engagement Agreement, which is uniform. Doc. 178 at 31. At this point, CLC's idea of bespoke services is purely

hypothetical because it has not identified any instances where it performed such services for an individual within the putative class.

Second, CLC argues that on Ensminger's legal theory, typicality would be defeated since the date when third-party credit reporting bureaus delete items varies, meaning that "fully performed" implicates non-uniform third-party practices. Doc. 171 at 31, 34. But "fully performed" refers to the date of invoice on Ensminger's legal theory, and invoicing occurs only after CLC confirms third-party deletion. When third parties delete is irrelevant since CLC fully performs its services only once it generates an invoice after confirming that third-party credit bureaus have deleted items. As the record reveals the dates of retainer payment and dates of invoice—and for each putative class member, the date of payment precedes the date of invoice—no individualized inquiry is necessary, and Ensminger's claim is typical.

**4.** Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of putative class members. Furthermore, "[t]he adequacy requirement asks whether the named plaintiffs and counsel (a) have any conflicts of interest with other class members and (b) will prosecute the action vigorously on behalf of the class." *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 671 (D. Kan. 2013); *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1204 (10th Cir. 2006); *see also Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002).

CLC asserts that Ensminger is not adequate for three reasons. It argues he lacks credibility concerning his claims, he has delegated to his counsel unfettered discretion to conduct the litigation as evidenced by his inability to recall several of his attorneys' names, and that he lacks standing, thereby creating a conflict with other class members. Doc. 171 at 24–25. The first and third arguments have already been rejected. *See supra*. The second argument, though, presents a new concern.

Regarding the new delegation argument, CLC cites *Robinson v. Gillespie* as support for its position that allowing class counsel unfettered discretion violates Rule 23(a)(4). 219 F.R.D. 179, 186 (D. Kan. 2003). CLC points to Ensminger's inability to recall the names of every one of his attorneys as evidence that he allowed them unfettered discretion. Doc. 178-2 at 6. But evidence that the named plaintiff stays in contact with lead class lawyers and has at least a basic grasp of the case, which Ensminger does, adequately counteracts that contention. *See Schwartz*

*v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 553 (D. Colo. 1998) (finding that an understanding of the "gravamen" of the case and familiarity "with the basic outline of the action," is sufficient for a plaintiff to be adequate).

There is no dispute that his counsel is adequate. Doc. 178 at 18. And this record does not indicate that Ensminger has given "unfettered discretion" to his counsel or that there is a conflict of interest between Ensminger and the class resulting in less than zealous advocacy on behalf of the class. As a result, Rule 23(a)(4) is satisfied.

### C

In addition to satisfying Rule 23(a), plaintiffs must satisfy "the requirements of one of the types of classes in Rule 23(b)." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010); Fed. R. Civ. P. 23(b). Ensminger invokes Rule 23(b)(3).

A class action may proceed under Rule 23(b)(3) when "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3)'s predominance inquiry looks to "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the noncommon, aggregation-defeating, individual issues." *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1175 (10th Cir. 2023) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). Superiority looks to whether other methods of resolution are preferable to class action. *Id.* at 1190.

Ensminger has shown that the common issues are more central and important than the individualized issues and that class action is superior to other methods of adjudication. He therefore satisfies the requirements for the proposed class to be certified under Rule 23(b)(3).

**1.** "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). In short, predominance requires first identifying each aspect of a claim and categorizing whether each aspect is individualized or common based on the inquiry and proofs required, and then weighing the common questions against the individualized questions. *Id.* at 1087; *see also Wallace B. Roderick Revocable Living Trust v. XTO*

*Energy, Inc.,* 725 F.3d 1213, 1220 (10th Cir. 2013). Where the injury is common to the class and stems from the same legal theory, common questions are more likely to predominate. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (explaining that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws," provided that the method of injury is common to the class).

Common questions predominate over any remaining individualized questions. Ensminger has only one claim for certification: that CLC violated Section 1679b(b). Under Ensminger's theory, his proposed class must prove that Section 1679b(b) requires that *all* services be performed before *any* payment is received and that CLC received payment before all services had been completed. *See* Doc. 45 at ¶ 46–54. Both questions are common because they are susceptible to common legal proof—statutory interpretation or interpretation of a standard form contract—that will settle those questions for the entire class at once. And each putative class members' alleged injury is the same: lost time value of money due to payment prior to the completion of all services in violation of Section 1679b(b). Lastly, if Ensminger succeeds, calculating individual damages will be straightforward. Each class member gets back the amount they paid based on the internal spreadsheet produced during discovery. It is a matter of finding the right column and user ID and adding it up.

**2.** A plaintiff proceeding under Rule 23(b)(3) must also show that a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) includes an illustrative list of factors to consider, including the class members' interests in controlling the prosecution of separate actions; the extent and nature of any litigation already begun by or against class members; the desirability of concentrating the litigation of the claims; and the likely difficulties in managing a class action. *Id.*; *see also Menocal v. GEO Grp., Inc.,* 882 F.3d 905, 915 (10th Cir. 2018). At heart, the superiority inquiry contrasts class treatment with alternative methods of resolution and asks whether alternative methods are preferable. *Black* 69 F.4th at 1190.

Class treatment is superior for two reasons. First, class members' individual economic injury is likely to be too low to support independent prosecutions. As the Tenth Circuit has noted, that is a strong reason to believe a class action is a superior procedural vehicle. *Menocal*, 882 F.3d at 915 (citing *Amchem*, 521 U.S. at 617). Moreover, as all

putative plaintiffs have a common question as to liability, its resolution on a class-wide basis would substantially advance judicial economy and prevent CLC from facing the possibility of inconsistent decisions.

Second, statutory alternatives for resolution are not preferable. In this case, the putative class could theoretically wait for state or FTC enforcement, both of which are provided for by statute. *See* §§ 1679h(c) and 1579h(b)(1). But waiting for a state or the FTC is not superior to class action treatment because there is no indication on this record that state or FTC enforcement is impending, so both parties would have to incur further uncertainty and delay.

CLC's contrary argument is that exposure to class-liability is a crippling threat, which means a class action is not superior to individual resolution. Doc. 171 at 35. According to CLC, they may face outsized damage claims (a refund of all fees received from 17,296 customers) for what amounts to a very small injury to each proposed plaintiff (the lost time value of money over a few months) as a result of allegedly violating CROA. Doc. 171 at 35–37.

CLC's theory is not without support. Two district courts in other jurisdictions have held that a small injury resulting from an unintentional CROA violation that gives rise to large class damages is a sufficient reason to fail to certify a class on Rule 23(b)(3) superiority grounds. *See Helms v. ConsumerInfo.com, Inc.*, 236 F.R.D. 561 (N.D. Ala. 2005); *Hillis v. Equifax Consumer Services*, 237 F.R.D. 491 (N.D. Ga. 2006). In both *Helms* and *Hillis*, the courts expressed the view that it was unfair to subject the credit repair organizations to devastating and "disproportionate" class-wide damages, and as a result concluded that class action was not a superior method to individual actions. *Helms*, 236 F.R.D. at 569; *Hillis*, 237 F.R.D. at 507.

But other cases, including binding cases from the Tenth Circuit, have held that the possibility of "annihilating [damages] is not a valid basis for refusal to certify" a class under Rule 23(b)(3) when, as here, statutory damages are at issue. *Circle v. Jim Walter Homes, Inc.*, 535 F.2d 583, 589 (10th Cir. 1976); *see also Braver v. NorthStar Alarm Servs., LLC*, No. CIV-17-0383-F, 2019 WL 5722207, at *6 (W.D. Okla. Nov. 5, 2019) ("the potential for disproportionate damages is not, in the circumstances of this case, a reason to decertify."). Other courts have even gone so far as to suggest that refusing to certify a class on the belief that the damages Congress provided are too high would implicate separation of powers concerns. *Bateman v. Am. Multi-Cinema, Inc.*,

623 F.3d 708, 722–23 (9th Cir. 2010); *accord McDaniel v. Credit Sols. of Am., Inc.,* No. 3:08-CV-0928-N, 2012 WL 13102240, at *9 (N.D. Tex. Mar. 21, 2012) ("For the Court to deny certification because damages are too big would amount to this Court purporting to overrule Congress's policy determination (no cap on class actual damages) with its own."). As such, CLC's argument is unpersuasive.

### III

For the reasons set forth above, Ensminger's Motion for Class Certification, Doc. 144, is GRANTED.

It is FURTHER ORDERED that Plaintiff Mark Ensminger is appointed as class representative.

It is FURTHER ORDERED that the law firms of Stecklein & Rapp Chartered and Keogh Law, Ltd. are appointed as class counsel.

It is so ordered.


Date: September 28, 2023     <u>  s/ Toby Crouse</u>
                             Toby Crouse
                             United States District Judge